COMMONWEALTH vs. JANICE ROBINSON.

No. 88-P-373.

Suffolk. October 17, 1990. - January 31, 1991.

Present: SMITH, FINE, & IRELAND, JJ.

*Homicide. Evidence*, Relevancy and materiality. *Practice, Criminal*, Required finding, Conduct of prosecutor, Argument by prosecutor. *Wanton or Reckless Conduct.*

At the trial of an indictment for manslaughter the evidence, both circumstantial and inferential, was sufficient, at the close of the Commonwealth's case, to warrant a rational trier of fact to find beyond a reasonable doubt that the defendant placed large amounts of salt in the nursing formula her child was fed, causing his death. [71-73]

At the trial of a manslaughter indictment, the judge correctly denied the defendant's motion for required finding of not guilty following the verdict, where sufficient evidence of the defendant's wanton and reckless conduct was presented. [73-74]

At a criminal trial, where the prosecutor reasonably believed at the time of his opening statement that certain evidence would be admissible and, in fact, the matters were rendered inadmissible, upon the defendant's objection, by an order announced after the prosecutor's opening statement, the references in the opening statement did not constitute prosecutorial misconduct. [74-76]

There was no merit to a criminal defendant's claims that the prosecutor improperly attempted to circumvent the judge's ruling excluding certain evidence [76], or that the prosecutor exceeded the bounds of proper argument [76-77].

INDICTMENT found and returned in the Superior Court Department on May 23, 1984.

The case was tried before *Robert A. Mulligan*, J.

*Kim C. Rosen* for the defendant.

*Annemarie Relyea-Chew*, Assistant District Attorney, for the Commonwealth.

SMITH, J. On February 27, 1984, the defendant, a nineteen year old mother, brought her eleven month old son (the child) to the Children's Hospital in Boston. After an exami-

nation, he was admitted to the hospital; it was his third admission. After admission, he was diagnosed as suffering from "failure to thrive" because of his below average growth and poor weight gain.[1] On March 3, while in the hospital, the child became critically ill. Tests revealed a dangerously high level of sodium chloride (sodium) in the child's blood and in the formula he was being fed. He died on March 5, 1984. An autopsy was performed. The medical examiner determined that the child's death resulted from poisoning caused by massive salt intoxication. There was no organic reason found to explain the child's failure to thrive.

On May 23, 1984, a Suffolk County grand jury indicted the defendant for manslaughter in connection with her son's death. Before trial, the defendant filed a motion to exclude certain psychiatric evidence derived from a forty-five minute private conversation between the defendant and a physician. The defendant also filed a motion to suppress two nursing bottles (nursers) used in feeding the child while at the hospital and the results of tests showing the nursers' contents to be tainted with dangerous concentrations of sodium. Both motions were denied.

The defendant obtained leave to appeal the denial of each motion. The Supreme Judicial Court reversed the motion judge's denial of the exclusion motion and precluded the psychiatric evidence from being introduced at the trial. *Robinson v. Commonwealth*, 399 Mass. 131, 132-136 (1987). The court, however, affirmed the motion judge's denial of the defendant's suppression motion. *Commonwealth v. Robinson*, 399 Mass. 209, 215-218 (1987).

The case was tried before a Superior Court judge and a jury. The defendant's motions for a required finding of not

---

[1]The medical condition known as "failure to thrive" is a chronic, potentially life threatening disorder of infancy and childhood. The term is used to describe infants and young children whose weight is persistently below the third percentile for their age on standardized growth charts, or less than eighty-five percent of the ideal weight for their age.

Failure to thrive results either from an organic condition, such as a serious pediatric illness, or from a nonorganic source, including the failure of the infant or child to receive adequate, proper food.

guilty were denied after the close of the Commonwealth's case and after the close of all the evidence. The jury found the defendant guilty of involuntary manslaughter. Her motion for a required finding of not guilty filed after the return of the guilty verdict was also denied.

The defendant has raised numerous issues on appeal. She challenges the judge's denials of her motions for a required finding of not guilty filed during the trial and also after the return of the verdict. The defendant also contends that the judge erred in some of his evidentiary rulings. Finally, the defendant contends that the prosecutor engaged in misconduct of such a nature that a new trial is required.

We start our analysis with the "required finding" issue. During the course of summarizing the facts necessary to our decision on that issue, we will dispose, by footnotes, of some of the other claims raised by the defendant.

1. *Denials of motions for required finding of not guilty.*

a. *Denials of motions filed during trial.* The defendant agrees with the Commonwealth that the child died of salt poisoning and that the excessive salt found in the child came from a quart bottle containing his formula. The defendant argues, however, that the Commonwealth failed to present sufficient evidence that she was the person who put the salt into the formula.

In deciding the issue raised by the defendant, we apply familiar standards. "In reviewing the denial of motions for [required findings of not guilty] in criminal cases, we have frequently said that 'we must consider and determine whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged . . . .' " *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). "We consider the state of the evidence both at the close of the Commonwealth's case and at the close of [all] the evidence." *Commonwealth* v. *Helfant*, 398 Mass. 214, 216 (1986). We note that the Commonwealth's position as to proof did not deteriorate after it closed its case.

We summarize the evidence as it may have appeared to the jury. While a patient, the child received feedings of Pregestimil, a special formula stocked by the hospital's pharmacy. Most formulas are "ready-to-feed" in four or eight ounce bottles. Pregestimil, however, is a special formula requiring hand-blending. It is prepared in the hospital's milk laboratory daily according to the attending doctor's daily prescription. The laboratory would prepare thirty-two ounces of the formula at a time and deliver it in quart bottles to the refrigerators in the divisional kitchens at about 2:30 P.M. to 3:05 P.M. each day. The formula would be transferred from the quart bottle to a nurser at feeding time. Each quart bottle was labeled with the patient's name.[2] Unused formula in the quart bottle from the previous day is thrown out when fresh formula is placed in the divisional kitchens. The kitchen, which was a part of the division where the child was being treated, had a sign outside its door stating "Authorized Personnel Only." Parents of the patients, however, were allowed to enter and had access to their children's food, including the quart bottles of formula. In addition, parents were allowed to feed their own children.

From February 27 to February 28, the child lost a small amount of weight. He was placed on an intravenous unit (I.V.) on February 28. At that time, the total amount of salt in the child's body was equivalent to two and three-quarters teaspoons, a normal amount of salt. On February 29, the defendant commented to a nurse that the child was getting puffy from the I.V. and, on Thursday, March 1, she said, "if only he could be that big all the time."

In the afternoon of March 1, another parent whose child was a patient at the hospital overheard the defendant lamenting the fact that the child's medical problems were not yet solved. During this conversation, while holding the child on her lap, the defendant said, "Poor little thing would be better off dead."[3] Later the same day the defendant com-

---

[2]On March 2, there were sixteen or seventeen children on Pregestimil.

[3]The defendant claims that it was error for the judge to admit the statement because it was irrelevant and highly prejudicial. There was no error. Evidence is relevant if "it has a rational tendency to prove the issues made

mented to the nurse that the child's puffiness made him look good. The nurse pointed out that he was bloated from the I.V. fluids. The defendant knew that the I.V. fluids contained salt.

A Mrs. Roche and a Mr. and Mrs. Keller, parents of children receiving treatment in the hospital, had become friendly with the defendant. While they were in the parents' waiting room, the defendant told them that "they were trying to take her baby away." When asked who was trying to take the [child] away, the defendant responded, "I read [the child's] chart. They're trying to take my [child] away." According to Mr. Keller, the defendant said, "I can't believe Social Services [is] investigating me for child abuse."[4] Later that week, Mrs. Roche heard the defendant say that she was concerned that the child was not gaining weight and "she had to come up or figure out some way to get him fattened up so she [could] get him out and take him home". Also during the week, the defendant told Mrs. Roche that while she was pregnant she had become overweight and her obstetrician told her to stop using salt. The defendant also told an investigator that she knew salt was bad and could lead to swelling. In a later conversation with an investigator she said she

by the pleadings or other incidental material issues developed in the course of the trial." *Commonwealth* v. *Booker*, 386 Mass. 466, 469 (1982), quoting from *Commonwealth* v. *Durkin*, 257 Mass. 426, 427-428 (1926). Here, the statement was probative of indifference and disregard exhibited by the defendant toward the child and was relevant and probative on the issue of reckless and wanton conduct by the defendant. The statement was made after the defendant came to believe that she was being investigated for child abuse, and one day before the child received the initial load of salt.

[4]The defendant objected to the words "for child abuse" in Keller's testimony. She argued that the prosecutor had violated a pretrial discovery agreement that he had entered into with the defendant whereby the Commonwealth had promised to provide to the defendant the statements of the Commonwealth's witnesses. The defendant claimed that Keller's statement did not include the words "for child abuse."

The prosecutor responded that he had expected Keller's testimony to be the same as Mrs. Roche's and that Keller, on his own, added the words "for child abuse" in the course of his testimony. The prosecutor stated that he was as surprised as the defendant by the addition. The judge found no violation of the pretrial agreement and overruled the defendant's objection. There was no error.

remembered that during her pregnancy a doctor had told her salt was not good for the kidneys and that she used unsalted potato chips during her pregnancy.

In the afternoon of March 1, around 2:30 P.M., a dietary aid saw the defendant in the divisional kitchen making tea. The dietary aide left but returned to the kitchen at 3:05 P.M.. At that time, she observed and wiped up from the counter some white particles which she assumed to be sugar.[5] At 10:00 A.M. on March 2, another dietary aide saw the defendant boiling water in the kitchen. At noon on the same day, a nurse entered the divisional kitchen and discovered that the round tupperware container of salt packets was not in its normal place. Instead, she found a square plastic container of salt packets among the sugar and crackers. The nurse observed that about forty or fifty of the packets were empty and there was no loose salt in the container. Later, the defendant's fingerprints were found on two of the empty salt packets.

On March 2 at 3:00 P.M., the child underwent a pancreatic stimulation test. This test required that the child not be fed the whole day. During the test, however, he was to receive intravenous fluids. At about 5:00 to 5:30 P.M., while the child was undergoing his test, Mrs. Roche and the defendant were in the hospital cafeteria. Mrs. Roche saw the defendant take more than a "handful" of salt packets from the serving line and place them in her "pocketbook/pouch." When Mrs. Roche asked about the salt, the defendant answered that

---

[5]One of the Commonwealth's expert witnesses testified that after the child's death, information obtained over the course of the February 27 through March 5 admission was analyzed. The data included the child's weight, blood chemistry analysis, fluid intake, urine output, and chemical composition and specific gravity of the urine. The witness testified that the child's sodium level increased from two and two-thirds teaspoons of salt on February 28 to an additional three and three-quarters teaspoons of salt by March 2. By the morning of March 3, the child's body contained yet another five teaspoons of salt. The witness testified that, in his opinion, two salt loads were administered to the child at different times. The first load, according to the witness, was sometime between 1:00 P.M. on March 1 and 3:00 P.M. on March 2, the second after 7:30 P.M. on March 2 and before 8:00 A.M. on March 3.

there was very little salt in the divisional kitchen and if she got hungry later she wanted to have some salt to put on her salad.[6]

The child was returned to the defendant after the pancreatic stimulation test at approximately 8:00 P.M. The defendant told the nurse that she had saved dinner and would feed the child. The nurse, one Turner, did not see the defendant feed the child at that time.

Nurse Turner checked with the defendant an hour later in the child's room. The defendant said that she had fed the child "one teaspoon of cereal, one-half teaspoon of fruit, two peas and [one half ounce] of Pregestimil." An hour later, at 10:00 P.M., Turner noted that the child's feet and eyes were marked by puffiness. The defendant told her that the child had refused to take any more from the bottle. Turner told the defendant that the child should be fed again because of his lack of food during the day. During this conversation, the defendant pointed out that the child had received intravenous fluids during the day, he looked puffy and "good," and that "[i]t's too bad it's just fluid."

During the night, around midnight, the child started screaming. A nurse removed the child from his bed for a feeding. Another nurse, Clarke, warmed the child's formula, drawn from the quart bottle in the divisional kitchen refrigerator. Then, she transferred the warmed formula into the nurser that another nurse had found on the child's bedside table. The nurse tried to feed the child from the nurser but he continually struggled and would "suck, swallow, turn his head and scream." He ended up ingesting two ounces of the formula. Next, another nurse attempted, unsuccessfully, to feed the formula to the child. She used a child's cup taken from his bedside table. During this feeding, the child also

---

[6]The defendant objected to Mrs. Roche's testimony on the ground that the prosecutor had delayed in giving to her the contents of the witness' statement. The prosecutor responded that he interviewed Mrs. Roche on June 4 at about 7:00 P.M. and gave the statement to defense counsel the following morning. The judge, after hearing that defense counsel knew of Mrs. Roche's testimony fifteen days before she testified, permitted the Commonwealth to introduce the testimony. There was no error.

refused it and continued to scream. The nurse put him down in a playpen located in the hallway so she could observe him during the rest of the night. The child continued to cry until 4:00 A.M. At that time, the child took in eight ounces of formula from the nurser and child's cup. Replaced in his crib, he went to sleep. At this time, a nurse observed that the child still appeared "a little puffy in the face [and had] a little bit of a runny nose."

Sometime between 4:00 and 5:00 A.M., March 3, one of the other parents in the room woke the defendant, who was sleeping on a cot in the child's room. The child had started choking and vomiting. After changing the child's diaper and reporting his vomiting and excretion to the nurse, the defendant returned to her cot and slept. At about 7:00 A.M., the defendant brought the child out to Clarke, who was still on duty. The nurse observed that the infant was "breathing hard," "flopping," and had a fever. A doctor, one Parker, examined the child in the treatment room at about 7:30 A.M. She confirmed that the child's temperature was extremely high. The child's condition worsened and he became comatose and cyanotic. Resuscitative and diagnostic procedures, such as drawing blood to determine sodium and potassium levels, were undertaken. Sometime between 8:30 A.M. and 8:45 A.M., someone in the treatment room said the laboratory results were back and the sodium level was "234," an extremely high level.[7] At the time the sodium level was announced, no one had seen the defendant in or near the treatment room.

The child was moved to an intensive care unit (ICU) on the sixth floor. Between 8:50 A.M. and 9:00 A.M. the defendant arrived on the fourth floor. There, she encountered Mrs. Roche and told her that the child was ill "because his sodium level was high, that he had too much salt in his body, that it must have been something he ate or drank." At that time,

[7]The normal level for sodium in a human is 135-145 milliequivalents ("mEq").

nobody outside of the treatment room had been told of the high sodium level.[8]

After the child was admitted to the ICU, another blood sample was taken by that unit's laboratory. The sodium level was even higher than the result obtained earlier. The hospital personnel were alarmed by the high sodium level and started to look for its origin in the hospital. Initially, they checked the intravenous fluid given to the child during the pancreatic stimulation test. The sodium level in the remaining 200-280 cc of fluid was normal, at one-half the percent of salt found in the human blood stream. Other items used in diagnostic testing on the child were excluded because the volume of their composition would not be large enough to create such a sodium level. The results of their preliminary investigation, coupled with the sodium levels found in the child, led the investigators to conclude that a massive dose of salt had been orally administered to the child. The investigators then tested a sample of the formula taken from the quart bottle which was in the refrigerator. The child had been fed that formula the previous evening. The sodium level in the sample was 2,200 milliequivalents ("mEq") and the chloride level was 2,000 mEq. Those levels indicated that an amount equivalent

---

[8]On June 22, nineteen days after the trial started, the prosecutor learned that a nurse named Person was in the treatment room during the child's crisis. She was interviewed and stated that she had learned that the child's sodium level was "extremely high." The nurse had "no memory" of leaving the room and telling the defendant.

The prosecutor told defense counsel of the interview on June 24, after both sides had rested but before final arguments. The defendant moved for a mistrial, claiming that if the jury heard the nurse's testimony they might believe that the defendant learned about the sodium level from the nurse before she talked to Mrs. Roche.

The trial judge, after hearing arguments, offered to reopen the case and have Person testify. The prosecutor was agreeable to call the witness to testify on behalf of the Commonwealth. The defendant declined the offer "on tactical grounds."

Appellate counsel now argues that the evidence was exculpatory and the prosecutor engaged in misconduct because he "wrongfully withheld" the statement. The argument is without merit. The defendant, as the judge's offer shows, could still have had Person's testimony but declined. Further, the evidence was not necessarily exculpatory, as the nurse would not have testified that she told the defendant of the sodium level.

to one-quarter pound of salt had been added to the formula in the quart bottle.

One of the investigators, a doctor, entered the child's room and found the defendant's belongings. He opened one of her suitcases and found a closed duffel bag. Inside the bag he discovered a nurser which still contained five ounces of formula. The doctor tasted the formula and found it extremely salty. A sample of this formula was then tested. The sodium level of the sample was 970 mEq and the chloride level was 980 mEq.

The milk lab was inspected at 1:30 or 2:00 P.M. The hospital authorities found no salt anywhere, because salt was not used by the laboratory personnel as an additive and, therefore, had never been stored in the milk lab. In addition, blood samples were drawn from all other babies for whom formula was prepared in the laboratory on March 3, and all of their sodium levels were normal.

The child died on Monday, March 5, never having regained consciousness. The defendant's mood became hysterical. When the defendant saw another mother, whom she had befriended, she commented, "He's not supposed to be dead. He is just supposed to be sick."

The defendant argues there was no direct evidence linking the defendant to the child's death and that the circumstantial evidence and its inferences were insufficient as matter of law to establish that link. We disagree and conclude that the evidence was sufficient to warrant a rational trier of fact to find beyond a reasonable doubt that the defendant placed large amounts of salt in the child's formula, causing his death.

Although the case against the defendant rested on circumstantial evidence, "[i]t is well settled that a case may be submitted to the jury on the issue of a defendant's guilt on circumstantial evidence." *Commonwealth* v. *Healy*, 393 Mass. 367, 383 (1984). "An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.' " *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989), quoting from *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). *Commonwealth* v.

*Arias*, 29 Mass. App. Ct. 613, 618 (1990). "In order to convict on circumstantial evidence, it is not necessary to show that it was not in the power of any other person than the defendant to commit the crime." *Commonwealth* v. *Salemme*, 395 Mass. 594, 601 (1985).

Here, there was evidence that the defendant had the means and the opportunity to commit the crime. Salt in large amounts was available to her, and she had access to the child's formula while it was being refrigerated. She was observed in and around the kitchen, the location of the refrigerator, on several occasions, including the relevant times that the two salt loads were added to the formula (see note 5, *supra*). A nurser containing salt-tainted formula was found secreted in the defendant's belongings. There was evidence which could indicate that on the morning of March 3 the defendant knew that the child's crisis was the result of salt ingestion before that fact was known to anyone else outside of the treatment room. Further, the defendant could have been found to have been motivated, however irrationally, to add salt to the child's formula. She suspected that the authorities were directing an investigation to her as the possible source of the child's failure to gain weight. She was aware that salt ingestion gave an appearance of added weight to the body. A reasonable inference could be drawn that the defendant added the salt to the formula to have the child give the appearance of weight gain, have him released from the hospital, and thereby deflect the investigation from herself.

It is possible, of course, that the salt was added to the child's formula by accident during the course of his stay at the hospital. There was, however, considerable evidence of painstaking investigations conducted by the hospital personnel to locate the source of the toxic amount of salt found in the formula. The results of those investigations, by a process of elimination, pointed to the defendant as the source. See *Commonwealth* v. *Arias*, 29 Mass. App. Ct. at 620.

In the circumstances, we conclude that the evidence was enough at the close of the Commonwealth's case so that the jury were not left to speculate as to the defendant's guilt. We

are satisfied that this case is distinguishable from *Commonwealth* v. *Salemme*, 395 Mass. at 599-601, and *Commonwealth* v. *Mazza*, 399 Mass. 395 (1987), on which the defendant relies and in which the Supreme Judicial Court held that the evidence was insufficient to sustain convictions.

b. *Denial of motion filed after verdict.* The defendant claims that the judge erred when he denied the defendant's motion for a required finding of not guilty of involuntary manslaughter filed after the return of the verdict (see Mass.R.Crim.P. 25[b], 378 Mass. 896 [1979]). The defendant argues that the Commonwealth failed to prove an essential element of involuntary manslaughter, that is, that the defendant's conduct was wanton or reckless.

Involuntary manslaughter is an unlawful homicide unintentionally caused by wanton or reckless conduct. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." *Ibid.* *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990). "[E]ven if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct in his dangerous act or omission, if an ordinary normal man under the same circumstances would have realized the gravity of the danger." *Commonwealth* v. *Welansky*, *supra* at 398-399. "Thus, under *Welansky*, a defendant's subjective awareness of the reckless nature of his conduct is sufficient, but not necessary, to convict him of involuntary manslaughter. Conduct which a reasonable person, in similar circumstances, would recognize as reckless will suffice as well." *Commonwealth* v. *Catalina*, 407 Mass. at 789.

"In deciding a rule 25(b)(2) motion for a required finding of not guilty following a guilty verdict, . . . [a trial judge and the reviewing court do] not properly exercise discretion concerning the weight or integrity of the evidence, but instead must assess the legal sufficiency of the evidence by the stan-

dard set out in *Commonwealth* v. *Latimore*, [378 Mass. at 677]." *Commonwealth* v. *Doucette*, 408 Mass. 454, 456 (1990). Viewed in the light most favorable to the Commonwealth, sufficient evidence of the defendant's wanton and reckless conduct was presented. There was evidence that the defendant wanted to "get [the child] fattened up so she [could] get him out [of the hospital] and take him home." She was aware from her own experience while pregnant that salt would add weight. She also knew that too much salt was bad for the kidneys and that her child was already in a weakened condition. Placing the equivalent of a quarter pound of salt into the child's quart bottle of formula in these circumstances could be found to be wanton and reckless conduct. The trial judge properly denied the defendant's motion for a required finding of not guilty of involuntary manslaughter.

2. *Claims of prosecutorial misconduct.* The defendant claims that during the various stages of the trial the prosecutor engaged in misconduct requiring a new trial.[9] In order to put the defendant's arguments in proper perspective, it is necessary that we briefly outline certain rulings by the trial judge on a motion in limine filed by the defendant.

In that motion, the defendant requested that the judge prohibit the Commonwealth from introducing expert evidence concerning the "failure to thrive" syndrome and a related syndrome, known as "Munchausen by proxy."[10] The day before the trial started, the judge allowed the motion in part and "barred [the Commonwealth] from introducing any evidence concerning either Munchausen by proxy or any profile evidence of the character, education, socio-economic condition, etc. of defendant . . . on the Failure to Thrive syndrome." The judge, however, did not preclude the Commonwealth "from introducing evidence of the physical condition of the child, . . . which led to his admission to Chil-

---

[9]We have already considered some of the defendant's claims. See footnotes 4, 6, and 8.

[10]See *People* v. *Phillips*, 122 Cal. App. 3d 69, 76-77, 78-79, 85 n.1 (1981), for a description of "Munchausen syndrome by proxy."

dren's Hospital and the Commonwealth can also introduce evidence concerning the course of [the child's] treatment at that institution."

Later, as we shall see, the judge modified his ruling, further limiting the Commonwealth's presentation of evidence on those matters that were the subject of the defendant's motion in limine. We now decide the defendant's claims as they arose during the various stages of the trial.

a. *The prosecutor's opening statement.* In his opening statement, the prosecutor represented to the jury that evidence would be introduced showing that, during the child's several hospital admissions, extensive testing was done and the results of those tests excluded the possibility that the child's failure to grow resulted from an organic disorder or disease. The prosecutor further represented that specific evidence would be presented that, throughout the course of the child's life, the defendant failed to provide the necessary nutrients to sustain her child's life and growth.

The defendant, immediately after the prosecutor's opening statement, moved for a mistrial on the ground that the prosecutor had violated the judge's ruling on the defendant's motion in limine. The judge denied the motion but refined his previous ruling on the defendant's motion. The judge ruled that the fact of the child's two previous hospital admissions was admissible but "no evidence of what occurred in the prior two hospitalizations will be admitted at trial." Further, the judge ruled that the Commonwealth will not be able to introduce any "direct evidence that the mother did not feed the child or that she provided inadequate nutrition for her child." The prosecutor, in accordance with the judge's ruling, did not introduce any evidence on those matters. The defendant now claims that the references in the opening statement constituted prosecutorial misconduct because the prosecutor knew that the evidence would not be admitted. The claim is frivolous.

A prosecutor may state in the opening statement whatever he reasonably and in good faith expects to prove by evidence. *Commonwealth v. Errington,* 390 Mass. 875, 883 (1984).

Here, the prosecutor reasonably believed, at the time of his opening statement, that the evidence objected to by the defendant would be admissible. Those matters were rendered inadmissible by the judge's order announced *after* the opening statement. In these circumstances, the prosecutor cannot be faulted for the contents of his opening statement. We also note that the judge, before the prosecutor's opening statement, instructed the jury regarding the limited effect and . purpose of opening statements. .

b. *The claim that during the trial the prosecutor attempted to circumvent the judge's rulings on the defendant's motion in limine.* The defendant claims that, despite the judge's exclusion of any direct evidence that the defendant provided inadequate nutrition to the child, the prosecutor attempted to elicit testimony on that issue. She argues that such misconduct was "egregious" and deprived her of a fair trial.

Throughout the trial, the judge permitted testimony that the child's failure to thrive did not result from organic causes. The judge, however, consistently excluded testimony on maternal/infant deprivation as an inorganic cause for failure to thrive. Because of the judge's rulings, the prosecutor had to walk a narrow path. A few times during the course of the trial, which lasted over three weeks, the prosecutor's questions could reasonably be considered as asking medical witnesses questions in regard to maternal/infant deprivation. The judge, when those occasions arose, brought the prosecutor back to the proper path of inquiry, and also immediately gave curative instructions to the jury. We have examined the examples (far fewer in number than the questions leading to reversal in *Commonwealth* v. *Long,* 17 Mass. App. Ct. 707 [1984], relied on by the defendant) mentioned in the defendant's brief and find the defendant's claim to be without merit. .

c. *The prosecutor's closing argument.* The defendant argues that the prosecutor's closing argument was "replete with errors." She cites only two alleged instances in her brief. Both times, the prosecutor properly was arguing rea-

sonable inferences from the evidence. See *Commonwealth* v. *Preziosi*, 399 Mass. 748, 753 (1987). Further, the judge gave strong instructions to the jury that the closing arguments were not evidence. Viewed in light of the "entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial," *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990), it is clear that the prosecutor did not exceed the bounds of proper argument.

*Judgment affirmed.*