COMMONWEALTH vs. LANCE W. JOHNSON.

Suffolk. December 4, 1991. - March 26, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Homicide. Practice, Criminal*, New trial, Argument by prosecutor, Cross-
    examination by prosecutor, Instructions to jury. *Evidence*, Admissions
    and confessions, Prior inconsistent statement, Cross-examination, Ex-
    planation of previous testimony. *Constitutional Law*, Confrontation of
    witnesses. *Witness*, Cross-examination, Explanation of previous testi-
    mony. *Intoxication*.

At a murder trial in which a codefendant had exercised his right not to
    testify, the prosecutor's use of the codefendant's prior statements sub-
    stantively against the defendant during closing argument to undermine
    the defendant's theory that the codefendant, and not the defendant, had
    stabbed the victim infringed the defendant's right, secured by the Sixth
    Amendment to the United States Constitution, to confront the wit-
    nesses against him and, consequently, although no objection was made
    by the defendant at trial, there was a substantial risk of a miscarriage
    of justice and a new trial was required. [321-324]
At a murder trial, the judge did not err in allowing the prosecutor, over
    the defendant's objection, to elicit from a police officer on redirect ex-
    amination further information about certain prior inconsistent state-
    ments of a witness at a hospital, once the defendant had elicited testi-
    mony on this subject during cross-examination. [324-325]
At a murder trial, no substantial risk of a miscarriage of justice was cre-
    ated by the prosecutor's use in closing argument of certain inconsistent
    statements that a witness had made to him before trial, where, since the
    prosecutor only repeated statements that the witness agreed she had
    made, he was merely arguing from the evidence and inferences fairly
    drawn therefrom and was not injecting his own personal knowledge into
    his closing argument. [325-327]
At a murder trial, the prosecutor's cross-examination of the defendant con-
    cerning a statement of the arresting officer was not an attempt to make
    the defendant comment on the officer's credibility; in addition, the pros-
    ecutor's attempt on cross-examination to have the defendant assess the
    credibility of other witnesses, although improper, did not, in the cir-
    cumstances, result in prejudicial error. [327-328]

At a murder trial, where there was evidence of the defendant's intoxication and the judge agreed to instruct the jury on the effect of voluntary intoxication on their consideration of a charge of murder in the first degree, it was error for the judge to omit an instruction of this issue. [328-329]

INDICTMENT found and returned in the Superior Court Department on April 17, 1985.

The case was tried before *Walter E. Steele*, J.

*Robert L. Sheketoff* for the defendant.

*Lauren Inker*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. The defendant appeals from his conviction of murder in the first degree in the death of Arthur G. Pearce. We have reviewed the entire record pursuant to our obligation under G. L. c. 278, § 33E (1990 ed.), to determine whether there is a substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Shelley*, 374 Mass. 466, 467 (1978), *S.C.*, 381 Mass. 340 (1980), and 411 Mass. 692 (1992). For the reasons stated in this opinion, we conclude that the interests of justice require reversal and a new trial. We comment on some of the other issues raised by the defendant that are likely to recur at his new trial.

The Commonwealth tried the defendant with Eric Clark (codefendant), who was charged with, and convicted of, assault and battery by means of a dangerous weapon on Pearce's friend, Brian Hopkins. There were at least two fights between the defendant and Pearce in the early morning hours of February 24, 1985. The Commonwealth's theory of the case was that the defendant, after the second fight broke up, returned and started a third fight during which he fatally stabbed Pearce. The defense acknowledged the first two fights, but contended that there was no third fight but only a brawl that broke out among several people during the second fight, during which someone else stabbed Pearce. The defendant's theory of the case included the possibility that his codefendant fatally stabbed Pearce.

We recite some of the facts that the jury could have found. On the evening of February 23, 1985, Pearce and Hopkins became intoxicated in a bar in Mattapan Square in Boston. On leaving the bar at about midnight, they proceeded to a taxi stand where they knew the dispatcher, Robert Downey, and another individual, Brian Vasta, who was talking with Downey at the time. A short time later, the defendant, seeking to hire a cab, arrived at the taxi stand. Shortly thereafter, the defendant and Pearce exchanged words, and a fight broke out between them. Downey separated them and told the defendant to leave. On leaving, the defendant threatened to kill Pearce.[1]

Shortly thereafter, a second fight between the defendant and Pearce broke out outside of the taxi stand. The defendant ended up on top of Pearce, and Pearce severely bit the defendant's finger. A passing motorist broke up this fight, and the defendant left the immediate area. Sometime after the first fight and before either this second fight or a third fight, the defendant met up with several other individuals, including the codefendant, Troy Johnson, and Stacey Jones, and sought their help in his ongoing altercation with Pearce.

Shortly after the second fight, a third fight broke out which involved more individuals than just the defendant and Pearce. It was during this third fight that the codefendant

---

[1] Several witnesses testified about the defendant's threats. Robert Downey testified that the defendant said, "I'm going to come back and kill you," to Pearce, while Brian Vasta testified that the defendant told Pearce, "I'm going to get you. I'm going to kill you." Even the defendant testified that he said to the individual who punched him, " 'I'll be back. I'm going to get you.' I believe I said, 'I'm going to kill you.' " Troy Johnson, whose testimony tended to support the defendant's theory of the case, also testified that the defendant later said to him that "he was going to kill the white boys that jumped him." Additionally, Sergeant James Curran testified that the defendant stated, during an interrogation, that he had said to Pearce during the second fight in which Pearce bit the defendant's finger, "I'll kill you. I'll be back. I'll kill you . . . ," while Brian Vasta testified that he heard the defendant threaten to "stick" Pearce during this second fight.

stabbed Hopkins and someone fatally stabbed Pearce.[2] The police apprehended the defendant as he was leaving the Mattapan Square area, and they returned him to the scene of the crime where two witnesses identified him as the individual who had stabbed Pearce.

1. *The codefendant's prior statements.* Although the codefendant exercised his right not to testify at trial, the Commonwealth introduced two of his prior statements in evidence. The Commonwealth first elicited testimony from Sergeant James Curran that he spoke with the codefendant on the Monday morning following the incident. When the prosecutor asked Curran what the codefendant said at that interview, the judge called a sidebar conference to discuss a potential problem under *Bruton* v. *United States,* 391 U.S. 123 (1968). The judge assumed at that point that the defense counsel would request only a limiting instruction, to which the defense counsel initially agreed. At the suggestion of the prosecutor that the defendant's name be redacted from Curran's testimony, however, the parties agreed to consider this matter during the luncheon recess. After the recess, the parties reported to the judge that they had agreed to redact the defendant's name from Curran's testimony about the codefendant's statement.

---

[2] Robert Downey testified that he "saw [the victim] holding his chest and stumbling backwards and [the defendant] was standing in front of him facing him going towards him in an open stance . . . . It was at this time that I noticed that he had a knife in his right hand." Brian Ahern, who was acquainted with both Pearce and Hopkins and happened on the scene during the second fight, testified that he saw the defendant grab Pearce by the arm and throw him against a metal grate on a shop that injured his face. Ahern then testified that the defendant "had a knife and he went in a downward motion and caught Artie Pearce in the upper chest." Brian Vasta also testified that just before the third fight broke up he saw Pearce on the ground with the defendant standing over him.

On the other hand, both Troy Johnson and Stacey Jones gave testimony that indicated that it was the codefendant, and not the defendant, who stabbed Pearce. Troy Johnson testified that the victim who was stabbed in the chest was fighting with the codefendant who had a knife, while the defendant did not have a weapon at the time of the stabbing. Stacey Jones also testified that the victim who was stabbed in the chest was fighting with the codefendant and not the defendant.

Curran then testified that the codefendant stated that he was one of a group of black males who had come around the corner to the front of the taxi stand, and that he had stood and watched a black male and a white male fight. According to Curran, the codefendant stated that, when he saw the black male get the better of the white male, two other white males came in the codefendant's direction, at which time he pulled a knife that may have gone into the arm of one of those white males.

The prosecutor later sought to elicit from Troy Johnson the details of a conversation that he overheard between the codefendant and Stacey Jones shortly after they left the scene and the police apprehended the defendant. Once again, the judge called for a sidebar conference and concluded, at defense counsel's suggestion, that the evidence was admissible only against the codefendant, and the judge so instructed the jury. Troy Johnson then testified that the codefendant said that he had "cut one of the [victims]." This statement implicates only the codefendant, and hence is simply not within the strictures of *Bruton.*

The defendant contends that, despite the redaction of the defendant's name from Curran's testimony, the prosecutor created a *Bruton*-type problem because he used the testimony of Curran substantively against the defendant in the Commonwealth's closing argument when, after referring to this testimony, the prosecutor asked the rhetorical question, "[W]ho stabbed Arthur Pearce?" The defendant also argues that the redaction of his name from Curran's testimony was ineffective because the following questions by the prosecutor created a risk of the contextual inculpation of the defendant. Because the defendant failed to object at trial, our review is limited to whether these alleged errors created a substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Cifizzari*, 397 Mass. 560, 574 (1986). *Commonwealth* v. *Brown*, 394 Mass. 510, 515 (1985).

The *Bruton* rule is concerned only with inculpatory statements of a codefendant who is unavailable for cross-examination. *Bruton* v. *United States*, 391 U.S. 123, 126 (1968). See

*Commonwealth* v. *Keevan,* 400 Mass. 557, 568-569 (1987) (*Bruton* teaching involves situation where nontestifying codefendant's confession inculpates another defendant). Even though a codefendant's isolated statement by itself might not be inculpatory, there is the risk that a defendant can be inculpated *"by the content of the statement taken in connection with other evidence in the case"* (emphasis in original). *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 8 (1973), and cases cited. In the present case, the prosecutor's question to Curran, following the question concerning the codefendant's statement, could well have indicated to the jury that the black male in the codefendant's statement was the defendant.[3] It was reversible error under G. L. c. 278, § 33E, therefore, for the judge to admit the statement. See *Keevan, supra* at 570. On retrial where the codefendant will not be a party, neither the statement to Sergeant Curran nor the statement overheard by Troy Johnson will be admitted.

It was error for the prosecutor to use the testimony of Curran and Troy Johnson in his closing argument and, after repeating the testimony of Troy Johnson that the codefendant admitted that he had stabbed "one guy," who could not have been Pearce, to raise the question, "[W]ho stabbed Arthur Pearce?" In essence, the prosecutor used this testimony substantively to raise the inference that, because the codefendant admitted that he stabbed only one person, who had to have been Hopkins, someone else besides the codefendant stabbed Pearce. This could have undermined the defendant's theory that the codefendant, and not the defendant, stabbed Pearce.

---

[3]The prosecutor's next question to Curran, following Curran's testimony concerning the codefendant's statement about watching a black male and a white male fight, was as follows:

THE PROSECUTOR: "When you were talking to [the defendant] on early Sunday morning at first at City Hospital and then over back at Area B, you indicated this morning that on each of those occasions he told you about being in a fight in a cab stand and after leaving, coming back and being involved in a fight in the middle of the street in which his hand was [bitten], is that right?"

THE WITNESS: "That's correct."

Moreover, this error created a substantial likelihood of a miscarriage of justice. One of the critical factors in this analysis is the relationship between the evidence and the premise of the defense. *Commonwealth v. Mahdi*, 388 Mass. 679, 696 (1983). That the codefendant and not the defendant stabbed Pearce was central to the defendant's theory of the case. See *Commonwealth v. Shelley*, 374 Mass. 466, 471 (1978) (prosecutor's improper remarks which "went to the very heart of the case" required reversal). We cannot conclude that the prosecutor's substantive use of the codefendant's statements in his closing argument had no effect on the jury and did not contribute to the verdict. This error, therefore, violated the defendant's right to confrontation under the Sixth Amendment to the United States Constitution. Our review of the record under G. L. c. 278, § 33E, therefore, leads us to the conclusion that there was a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Dias*, 405 Mass. 131, 137-138 (1989) (substantial likelihood of miscarriage of justice where jury able to consider codefendant's statements as evidence against other defendant).

2. *Issues that may arise at retrial.* We discuss the following claims of error because they may arise at retrial.

a. *The prior inconsistent statement.* Brian Hopkins testified as an eyewitness to the events, but because of his intoxication, he could only recall Pearce and the defendant exchanging punches with one another. He was unable to recall either his own stabbing or Pearce's stabbing. On cross-examination, defense counsel questioned Hopkins about a statement that he gave to the police while at a hospital later in the day of the incident. Hopkins stated that he did not recall telling the police at that time that he was stabbed by the same person who stabbed Pearce. The defendant contends that the prosecutor attempted later to revisit this issue during Detective Peter O'Malley's testimony, and that the judge, over the defendant's objection, allowed the prosecutor to elicit from O'Malley Hopkins's claim that Pearce had been stabbed by the same person with whom Pearce had been fighting that evening.

Contrary to the defendant's contention on appeal, it was not the prosecutor but defense counsel during the cross-examination of Detective O'Malley, who first raised the issue as to what Hopkins had said to the police at the hospital.[4] "Having opened the door to this information, the defendant essentially invited the Commonwealth to address the issue on redirect examination." *Commonwealth* v. *Otsuki*, 411 Mass. 218, 236 (1991). The defendant attempted to use the written police report of Detective O'Malley's interview with Hopkins, which was inconsistent with O'Malley's oral testimony, to support the defendant's theory that the codefendant may have stabbed Pearce. The prosecutor, therefore, was entitled on redirect examination to question O'Malley further about his interview with Hopkins.

b. *The prosecutor's injection of his personal knowledge and integrity into the trial proceedings.* The testimony of both Troy Johnson and Stacey Jones supported the defendant's theory that the codefendant stabbed Pearce, and the prosecutor attempted to impeach them through inconsistent statements which these witnesses had made to the prosecutor prior to trial. Troy Johnson answered all of the prosecutor's questions concerning his prior inconsistent statements either by agreeing with the prosecutor or stating that he did not remember having made them, and Stacey Jones, for the most part, also agreed with the prosecutor concerning the content of their prior conversation. Although not objected to at trial, the defendant argues on appeal that to permit the prosecutor to impeach a witness through the use of his own prior interview with that witness allows the prosecutor to inject his own personal knowledge and integrity into the proceedings, and effectively allows the prosecutor to testify without being subject to cross-examination. The defendant analogizes this

---

[4]Also contrary to the defendant's contention on appeal, while the defendant did object to the prosecutor's questioning of Detective O'Malley about Hopkins's statement at the hospital, the objection was that O'Malley was not being responsive to the question asked, and not that the question called for hearsay testimony.

technique to a prosecutor's injection of his own personal beliefs into a closing argument.

This court has previously stated that "[t]here is nothing improper in interviewing a witness before trial, or, subject to the judge's discretion, in cross-examining a witness concerning discrepancies between his in-court and out-of-court statements. Indeed, where the witness is one's own, such questions may be a prerequisite to the admission of prior inconsistent statements for the purpose of impeaching that witness. . . . [I]f no third person is present during a conversation between the witness and the prosecutor, the prosecutor has no basis for introducing the witness's prior inconsistent statement unless he obtains leave to withdraw from the case in order to do so." *Commonwealth* v. *White*, 367 Mass. 280, 284 (1975). See *Commonwealth* v. *Corliss*, 371 Mass. 266, 268-269 (1976). Additionally, G. L. c. 233, § 23 (1990 ed.), allows a party to prove that its own witness made prior inconsistent statements so long as the witness is first apprised of the circumstances and content of the prior statements and is given an opportunity to explain those statements.[5] In these circumstances, there is no error.

After reviewing the record of this case pursuant to our obligation under G. L. c. 278, § 33E, however, we believe that the prosecutor came perilously close to injecting his own personal knowledge and integrity into his closing argument where he restated several prior inconsistent statements which Stacey Jones had made to him. Arguments such as these do tend to inject the prosecutor's own credibility and veracity into the proceedings, and could force the jury to choose to believe either the witness or the prosecutor. We note that the

---

[5]General Laws c. 233, § 23 (1990 ed.), states that "[t]he party who produces a witness shall not impeach his credit by evidence of bad character, but may contradict him by other evidence, and may also prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them."

prosecutor could have avoided this problem entirely by presenting testimony from the other individual who was present during the interview with Stacey Jones, and we recommend, where possible, that prosecutors interview potential witnesses only in the presence of other individuals for this reason.

If the prosecutor were to argue in closing argument solely from his own personal knowledge concerning a witness's prior inconsistent statements, such an argument would tend improperly to pit the credibility of the prosecutor against that of the witness. See *Commonwealth* v. *Thomas*, 401 Mass. 109, 114-116 (1987). In this case, however, where the prosecutor only restated prior inconsistent statements that the witness agreed she had made to the prosecutor, he was merely arguing from the evidence and inferences fairly drawn therefrom and was not injecting his own personal knowledge into his closing argument. See *Commonwealth* v. *Smith*, 387 Mass. 900, 906-907 (1983); *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 315 (1973). There was, therefore, no error in the prosecutor's closing argument. Prosecutors, however, should take special care to avoid what might, in other circumstances, lead to the reversal of a conviction.

c. *The cross-examination of the defendant concerning the credibility of other witnesses.* The defendant contends that the prosecutor asked him to comment on the credibility of several witnesses at the trial: the arresting officer, Officer Curran, Detective O'Malley, who prepared a police report on the defendant's prior statements, and Troy Johnson. The prosecutor committed no error in his cross-examination of the defendant concerning the statement of the arresting officer. Contrary to the defendant's assertion, the prosecutor was not attempting to make the defendant comment on the credibility of the arresting officer. The prosecutor, instead, was attempting to make the defendant explain his own testimony. See *Commonwealth* v. *Dickinson*, 394 Mass. 702, 706 (1985) (proper to permit defendant to explain his own testimony). It was proper for the prosecutor to point out, through this line of questioning, that there were inconsistencies be-

tween the defendant's testimony and that of the arresting officer, so long as the defendant was not asked to assess the credibility of the arresting officer's testimony. *Id.* Any inference that the defendant was lying was no more probable than any innocent inference, such as a failure of recollection. See *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400, 402 (1983) (improper to imply that witness is lying rather than having a failure of recollection or some other innocent reason).

More problematic, however, was the cross-examination of the defendant concerning the testimony of the other police officers and Troy Johnson. Within each line of questioning, the prosecutor clearly attempted to have the defendant assess the credibility of these other witnesses. Such attempts are obviously improper. See *Commonwealth* v. *Dickinson, supra* at 706-707; *Commonwealth* v. *Ward, supra* at 401-402. These questions to the defendant, however, do not begin to approach the more than one hundred improper questions, several of which misstated the previous testimony of witnesses, in *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707, 708-709 (1984). See *Commonwealth* v. *Robinson*, 30 Mass. App. Ct. 62, 76 (1991) (no reversible error for several improper questions, "far fewer in number than the questions leading to reversal in *Commonwealth* v. *Long*"); *Commonwealth* v. *Kirkpatrick*, 26 Mass. App. Ct. 595, 603 (1988) (no substantial risk of a miscarriage of justice in two improper questions to defendant during cross-examination concerning credibility of another witness); *Commonwealth* v. *Flanagan*, 20 Mass. App. Ct. 472, 477-478 (1985) (no prejudicial error in four improper questions to defendant); *Commonwealth* v. *Brimley*, 19 Mass. App. Ct. 978, 979 (1985) (no serious prejudice to defendant in five improper questions to a witness); *Commonwealth* v. *Ward, supra* at 402 (no prejudicial error in single improper question to defendant). Nevertheless, prosecutors should use the utmost care to refrain from such improper questions.

d. *The failure to give a voluntary intoxication instruction.* During a bench conference prior to the jury instruction, defense counsel sought, and the prosecutor agreed to, a jury

instruction that voluntary intoxication could reduce murder in the first degree to murder in the second degree. Although the judge indicated that such an instruction would be given, the charge to the jury failed to address the issue of voluntary intoxication. Because there was evidence of the defendant's intoxication and the judge agreed to instruct the jury on the effect of voluntary intoxication, it was error not to instruct the jury on this matter. *Commonwealth* v. *Henson*, 394 Mass. 584, 593 (1985).

Because the interests of justice require us to order a new trial, we need not consider the defendant's arguments concerning the ineffectiveness of his counsel. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 269 (1989); *Commonwealth* v̇. *Dias*, 405 Mass. 131, 137 n.5 (1989). The judgment is reversed, the verdict set aside, and this case is remanded to the Superior Court for a new trial.

*So ordered.*