COMMONWEALTH *vs.* ARTHUR W. BROWN
(and five companion cases[1]).

Middlesex. February 5, 1985. — April 10, 1985.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Evidence,* Admissions and confessions, Common criminal enterprise. *Practice, Criminal,* Instructions to jury. *Homicide.*

Although a witness at the trial of two defendants for murder could not say which of the two had made each individual statement during a conversation the witness had with the defendants, admission of the witness's testimony concerning these statements, incriminating the defendants in the murder, did not create a substantial risk of a miscarriage of justice. [514-516]

At the trial of a murder case the judge's instructions to the jury on joint criminal enterprise did not create a substantial likelihood of a miscarriage of justice. [516]

At the trial of a murder case, the judge's failure in instructing the jury expressly to state that malice aforethought constitutes a necessary element of murder in the first degree committed with extreme atrocity or cruelty was not error, where the judge first correctly defined murder, including malice aforethought, and then went on to describe the additional requirements for murder in the first degree. [516-517]

Where a defendant in a murder case did not ask the judge to instruct the jury that they could consider evidence of the defendant's intoxication in determining whether the defendant was capable of committing murder with extreme atrocity or cruelty, and where there was no indication that the defendant's case included such a theory, the judge's failure to instruct the jury on the effect of intoxication did not create a substantial likelihood of a miscarriage of justice. [517]

INDICTMENTS found and returned in the Superior Court Department on May 6, 1982.

The cases were tried before *Roger J. Donahue,* J.

*Lawrence R. Glynn* for Kevin Roach.

---

[1] Two against Arthur Brown and three against Kevin Roach.

*Anthony M. Traini* (*Russell R. Weddell* with him) for Arthur W. Brown.

*Jeffrey B. Abramson,* Asssistant District Attorney, for the Commonwealth.

NOLAN, J. On May 6, 1982, a Middlesex County grand jury returned indictments charging each of the defendants, Arthur Brown and Kevin Roach, with murder in the first degree, armed robbery, and larceny of a motor vehicle. After a jury trial, both of the defendants were found guilty on all three charges. The trial judge sentenced each defendant to imprisonment for life on the murder conviction, a concurrent ten- to fifteen-year term on the armed robbery conviction, and a concurrent nine- to ten-year term on the larceny of a motor vehicle conviction. Each defendant appeals from these convictions. We find no reversible error or any reason to grant relief under G. L. c. 278, § 33E. Accordingly, we affirm the judgments.

On appeal, the defendant Roach claims error in that (1) the testimony of a Commonwealth witness concerning admissions by both codefendants was erroneously admitted in evidence because it constituted inadmissible hearsay and violated his right under the Sixth Amendment to the United States Constitution to confront witnesses against him when Brown did not testify; and (2) the judge erred in instructing the jury as to when a joint venture begins and ends. The defendant Brown argues that (1) the judge's instructions to the jury permitted them to convict the defendant under a joint enterprise theory without finding that each participant in the joint venture shared the mental state required for each crime; (2) the judge failed to instruct the jury that malice aforethought is an element of murder in the first degree based on extreme atrocity or cruelty; and (3) the jury were not allowed to consider evidence of voluntary intoxication in determining whether the defendant had the capacity to form the intent required for the crimes charged. Each defendant also argues that he should receive relief under G. L. c. 278, § 33E.

The Commonwealth presented evidence from which the jury could have found the following facts. In the early morning hours of March 4, 1982, residents of a Cambridge apartment

building heard a disturbance emanating from the apartment occupied by the victim, Carl Loebig. The resident of the apartment located directly below the victim's apartment subsequently was awakened by the sound of water dripping from his bathroom ceiling. He awakened the building superintendent and reported the leak. The two men then went upstairs to the victim's apartment. After knocking on the door and receiving no response, the superintendent opened the door and discovered the victim's body on the floor of the entrance way. He had been stabbed approximately forty times.

The superintendent telephoned the police, and they arrived at the apartment a short time later. The police noted blood stains in the hallway outside of the apartment, and on the walls of the stairwell. The victim's body was lying in a pool of blood, and a cardboard box covered the area of the body where the head was. The apartment had been ransacked. The police observed footprints, which appeared to have been made by ripple-soled shoes, in the blood surrounding the body. They found that the bathtub was full of rust-colored water, and discovered a kitchen knife in the tub. Further investigation revealed a palm print on the bathtub; the print subsequently was identified as that of the defendant Roach. Roach's fingerprint also was found on a juice bottle in the apartment. Outside of the apartment building, the police found blood stains in the snow, and discovered an empty vodka bottle.

At approximately 10:30 P.M. on March 3, 1982, the victim had telephoned Mary Whitty, the defendant Brown's sister. The victim told Whitty that he had received a telephone call from her brother, who was with a friend. Brown and his friend had been drinking heavily. Brown had asked the victim to come to the "Combat Zone" area of Boston, pick Brown and his friend up, and bring them back to the victim's apartment. Whitty advised the victim that he should create an excuse to avoid picking up the pair.

Brown went to the New England Medical Center at approximately 2:18 A.M. on March 4, 1982. He was treated for a lacerated index finger, and received seventeen stitches. Later, at approximately 4:00 A.M., both defendants arrived at the

Hyannis home of Roach's sister. She and a second sister observed that both defendants had blood on their clothing and shoes, and both appeared intoxicated. Brown's hand was bandaged. The defendants had a bottle of vodka and a camera with them. They slept for several hours. Upon awakening, Brown changed his clothes and Roach ate breakfast. The defendants left the house at approximately 8:30 A.M.. Before leaving, they gave the camera to Roach's sisters, who subsequently threw it away at the Yarmouth town dump. A man named Joseph Yonuss communicated with a Boston Police detective, whom he had known for a number of years, at approximately 10:00 P.M. on March 4, 1982. Yonuss told the detective that he knew that Kevin Roach and a man named "Butchie" were responsible for the Cambridge murder. Yonuss subsequently identified Brown from a photograph.

Yonuss told the police that he had been in a bar in the Combat Zone earlier that day and had observed the defendants drive past the bar in a brown automobile. Roach later entered the bar and asked Yonuss for some marihuana. Yonuss obtained the marihuana and brought it to the defendants. Brown and Roach were drinking vodka sitting in the car, which was parked in an alley behind the bar.

Yonuss and the two men smoked the marihuana cigarette. He noticed that Brown's hand was bandaged, and later observed blood stains in the car. Subsequently, Yonuss went back into the bar and the defendants left. The defendants later returned in the car and the three men went to Yonuss's apartment in Boston, which he shared with another man and a woman.

The three men sat in the kitchen of Yonuss's apartment, drinking vodka and talking. The defendants told him that they had executed a robbery in Cambridge on the previous night. They stated that they had taken a camera, a lens, some cash, and some change. They also told Yonuss that they had driven to Hyannis during the night and had given the camera to Roach's sister.

While the three men were talking, the television was on in the next room, and a news report of a stabbing death in Cambridge was broadcast. According to Yonuss, one of the defend-

ants reacted to this news with the exclamation "Oh my God, this is it." One defendant stated, "This is number 1, the big one." Yonuss testified at trial that both defendants were present when all of these statements were made, but he could not specifically attribute any statement to a particular defendant.

After the defendants indicated their involvement in the murder, Yonuss asked whether the car they were driving belonged to the victim. They responded that it did belong to the victim and Yonuss suggested that they dispose of the car. The defendants then left the apartment, drove the car to South Boston, and abandoned it there with the keys in the ignition. When the defendants told Yonuss what they had done with the car, he proposed burning it. The three men moved the car to a more isolated location, set it on fire, and then returned to the apartment. Roach later left the apartment, and while he was out an altercation took place between Brown and Yonuss. Yonuss subsequently left the apartment and alerted the police detective.

1. *Admissibility of testimony concerning out-of-court statements by the defendants.* At trial, Joseph Yonuss testified that these conversations took place in his apartment prior to and shortly after news of Loebig's death was broadcast on the television. According to Yonuss, each defendant either said or heard the other say that they had perpetrated a robbery in Cambridge the previous night, but that the "simple robbery turned into a murder." Yonuss related additional statements, made by one or both defendants while both were present, that "they had fairly well butchered the guy," "[t]hat they almost decapitated him," and "that they had better leave the state."

On appeal, Roach argues that the admission of Yonuss's testimony violated his right under the Sixth Amendment to the United States Constitution to confront the witnesses against him. Roach apparently attributes all or some of the incriminating statements that Yonuss repeated to the jury, to Brown, who did not testify. Roach argues that under *Bruton* v. *United States,* 391 U.S. 123 (1968), and its progeny the trial judge's failure to sever the trial of the two codefendants resulted in a violation of his constitutional right to cross-examine Brown. There was no error.

Roach did not seek to have his trial severed from that of Brown at any time prior to or during the trial. Furthermore, neither defendant objected to the challenged testimony except to seek clarification as to which defendant made particular statements. No further objections were made after it was established that Yonuss could not attribute specific statements to a particular defendant. We consider, therefore, whether the alleged errors created a substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Roberts,* 378 Mass. 116, 123 (1979).

In *Bruton,* the United States Supreme Court held that the defendant's constitutional rights under the Sixth Amendment were violated where the extrajudicial statement of a codefendant, which incriminated the defendant, was admitted in evidence. *Bruton* v. *United States,* 391 U.S. 123, 126 (1968). The statements in *Bruton,* however, did not fall within a recognized exception to the hearsay rule. The Court expressly refused to intimate whether "such exceptions necessarily raise questions under the Confrontation Clause." *Id.* at 128, n.3.

Since *Bruton,* we have recognized that no violation of the confrontation clause occurs when the out-of-court statements are either express admissions by a defendant in a joint criminal enterprise, or admissions by silence. *Commonwealth* v. *Simpson,* 370 Mass. 119, 123 (1976), and cases cited.

We are of the opinion that each statement at issue either was made by Roach and constituted an admission, or was made by Brown and was impliedly adopted by Roach. Evidence of implied admissions through silence must be "received and applied with caution," *Commonwealth* v. *Boris,* 317 Mass. 309, 317 (1944). However, Yonuss testified that both defendants were present when each statement was made.

Moreover, the conversations that Yonuss related to the jury consisted of a number of highly incriminating statements and included a description of the robbery and murder. That Yonuss could not remember which defendant made each individual statement suggests that both defendants participated in this conversation. The statements at issue clearly would have produced a reply or denial on the part of an innocent person.

Roach argues that he was intoxicated at the time of this conversation, and, therefore any admissions he made or adopted in Yonuss's apartment were involuntary. Although it is clear that both defendants, as well as Yonuss, consumed substantial quantities of alcohol on the day this conversation occurred, we are not convinced that the totality of the circumstances shows that their statements were involuntary. See *Commonwealth* v. *Lanoue,* 392 Mass. 583, 586 (1984).

2. *Instructions to the jury.* Roach argues that the trial judge "insufficiently addressed" the matter of when a joint enterprise begins and ends in his instructions to the jury. He contends that this issue was important because it bore upon the admissibility of statements made by Brown. Roach's argument is without merit. The judge properly instructed the jury that a joint enterprise "has a beginning and an ending" and that it was their function to determine when any joint enterprise began and ended. The defendants did not ask the judge to clarify this issue further. Roach's general contention that the judge's charge was inadequate on this issue does not persuade us that the instructions, considered as a whole, created a substantial likelihood of a miscarriage of justice.

Brown contends that the judge erred in instructing the jury because he did not inform them that each participant in a joint enterprise must share the requisite criminal intent in order to be convicted of the crime as a principal. Again, no objection was made at trial.[2] The judge's instructions to the jury apprised them that the Commonwealth was required to prove that each defendant possessed the mental state required for him to be found guilty of each crime. The record before us does not indicate that a real controversy existed concerning whether one defendant lacked knowledge that the other possessed a weapon. We find no substantial risk of a miscarriage of justice in the judge's failure to instruct the jury on this issue. Compare *Commonwealth* v. *Watson,* 388 Mass. 536, 539 (1983).

Brown argues that the judge failed to instruct the jury that malice aforethought constitutes a necessary element of murder

---

[2] We note that Brown's trial counsel is not counsel on this appeal.

committed with extreme atrocity or cruelty. However, the judge properly defined murder as the killing of a human being with malice aforethought. He went on to define the meaning of the term "malice aforethought." After establishing a proper definition of murder, the judge described the additional findings that the jury would have to make in order to convict the defendants of murder in the first degree. There was no error.

Finally, Brown contends that his conviction should not stand because the jury were not permitted to consider evidence of intoxication in considering his criminal culpability. The defendants were tried after our decision in *Commonwealth* v. *Perry,* 385 Mass. 639, 648-649 (1982), where we held that the jury should have been permitted to consider evidence of intoxication in determining whether the defendant was capable of committing murder with extreme atrocity or cruelty. Brown did not ask the judge to give a *Perry* instruction, nor was there any indication at trial that Brown's defense included such a theory. The judge's failure to instruct the jury concerning intoxication did not create a substantial risk of a miscarriage of justice.

3. *General Laws c. 278, § 33E.* We have reviewed the entire record, and we see no reason to alter the verdicts or order a new trial for either defendant under the power which is given to us in G. L. c. 278, § 33E.

*Judgments affirmed.*