## COMMONWEALTH *vs.* JAMES G. MACKENZIE.

Middlesex. March 4, 1992. - August 21, 1992.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Evidence*, Hearsay, Admissions and confessions, Accomplice, Common
criminal enterprise. *Constitutional Law*, Confrontation of witnesses.
*Joint Enterprise. Practice, Criminal*, Required finding, Argument by
prosecutor, Cross-examination by prosecutor, Instructions to jury,
Lesser included offense, Assistance of counsel, Capital case. *Homicide.*

At the trial of indictments charging murder and armed burglary with as-
sault, certain aspects of a police officer's testimony that were attributa-
ble to the defendant's accomplice, that implicated the defendant in the
crimes, and that the defendant did not affirmatively adopt were inad-
missible hearsay contravening the defendant's right under the Sixth
Amendment to the United States Constitution to confront the witnesses
against him; however, the judge's erroneous admission of this testimony
did not, in the circumstances, create a substantial likelihood of a mis-
carriage of justice, nor was the defendant entitled to a required finding
of not guilty. [505-511]
At a criminal trial, certain testimony of a police officer, arising from a
custodial interrogation of the defendant and alleged to be in violation of
the defendant's rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966),
was properly admitted, where the evidence indicated that the defendant
had waived his Miranda rights and had signified his willingness to talk
with the police, and where there was nothing in the record to suggest
that the defendant had invoked his right to remain silent until after the
events of which he complained on appeal. [512-513]
On appeal from a conviction of first degree murder, even if it be assumed
that certain items admitted in evidence at the defendant's trial had
been unlawfully seized from the home of his mother, their erroneous
admission would afford the defendant no ground for relief under G. L.
c. 278, § 33E, in the absence of testimony at trial linking the items to
the murder or casting doubt on the defendant's own testimony that he
had taken the items in question a month prior to the murder. [513-514]
At a criminal trial, the prosecutor's unobjected-to questions during cross-
examination asking the defendant to comment on the credibility of a
government witness, inquiring about the defendant's failure to call alibi
witnesses, and asking the defendant to explain what reason the defend-

ant's accomplice would have for implicating the defendant in the crime
did not, in the circumstances, create a substantial likelihood of a mis-
carriage of justice. [514-516]
Where a defendant was convicted of first degree murder on the theories of
both felony-murder and murder committed with extreme atrocity or
cruelty, any error affecting the judge's instructions to the jury as to
felony murder was harmless. [516-517]
On appeal from a conviction of first degree murder, the defendant's claim
that his trial counsel was ineffective in certain respects provided no in-
dependent basis for relief under the broad scope of review afforded by
G. L. c. 278, § 33E. [517-518]

INDICTMENTS found and returned in the Superior Court
Department on July 3, 1986.

The cases were tried before *James D. McDaniel, Jr.,* J.

*Bruce R. Taub* for the defendant.

*Rosemary D. Mellor,* Assistant District Attorney, for the
Commonwealth.

LIACOS, C.J. The defendant, James G. MacKenzie, and
James Judge, were each charged with the murder in the first
degree of Lois Wentworth, a sixty-two year old resident of
Wayland who, at the time of her death, was the defendant's
neighbor. The two men were tried separately. On appeal
from his convictions,[1] the defendant argues that: (1) testi-
mony pertaining to the confession of James Judge, who had
implicated the defendant in the crimes and who did not tes-
tify at trial, was admitted in evidence improperly in contra-
vention of the defendant's right under the Sixth Amendment
to the United States Constitution to confront the witnesses
against him; (2) the judge erred in denying his motion for a
required finding of not guilty of murder; (3) evidence arising

---

[1]The defendant was convicted of murder on theories of felony-murder
and murder with extreme cruelty or atrocity. He was also convicted of
armed burglary with assault. The defendant was acquitted on a charge of
masked armed robbery. The jury returned no findings as to whether the
defendant was guilty of murder in the first degree committed with deliber-
ate premeditation.

The Commonwealth's brief reports that Judge was convicted of murder
in the first degree.

from a custodial interrogation of the defendant was introduced in evidence in violation of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966); (4) the judge erred in admitting evidence that was seized without a warrant from the home of the defendant's mother; (5) the prosecutor asked several improper questions during his cross-examination of the defendant; (6) the judge erred by failing to instruct the jury on the lesser included offense of burglary when instructing the jury on the charge of armed burglary with assault, and (7) the defendant received ineffective assistance of counsel at trial. We affirm.

We summarize the evidence presented at trial. The defendant lived at 23 Doran Road in Wayland, diagonally across the street from the victim. Approximately one month prior to Wentworth's murder, the defendant visited her with a friend, Robert W. McCall, to inquire whether McCall could rent a small cottage that was located on Wentworth's property.[2] Wentworth was reluctant to rent the cottage because it had fallen into disrepair. Eventually, she agreed to rent the cottage after McCall agreed to clean and repair it in exchange for a reduced rental rate.

In the middle of May, 1986, the defendant met McCall at the cottage to remove Wentworth's belongings. In the course of this undertaking, McCall told the defendant that he could keep anything he could "make a buck on." The defendant kept some silverware and other items. The defendant also kept some prescription pills. He told McCall he planned to check a Physician's Desk Reference to determine whether the prescriptions could make him "high." At trial, McCall testified that the defendant's eyes "lit up" when he discovered the prescription bottles and that, after the defendant had returned home, the defendant wondered if there were any more prescriptions "back over there." McCall further testified that, in the course of cleaning the cottage, the two

---

[2]The cottage was located approximately fifty feet from Wentworth's home and was referred to at trial as the "little house." Wentworth's house was referred to as the "big house."

men packed three boxes with pots, pans, books, and old pictures and that they brought these boxes to Wentworth in her home.

On June 5, 1986, Wentworth's body was discovered on her livingroom floor by her daily "Meals On Wheels" delivery person. Wentworth had been stabbed, beaten, and suffocated.[3] Her house had been ransacked. A television was blaring loudly in the livingroom. Empty prescription bottles were strewn across a table. Many of the victim's belongings were scattered about the house and the telephone cord had been pulled from the wall. However, the three boxes from the "little house" were left undisturbed in the livingroom.

Detective Sandra O'Brien of the Wayland police department was among the officers assigned to investigate Wentworth's murder. In the course of interviewing the victim's neighbors, she interviewed the defendant on June 9, 1986. The defendant told Detective O'Brien that he had been to the victim's house a month earlier and had helped McCall clean out the cottage. The defendant further stated that he had been home in bed with an eye injury on June 4 and June 5.[4] The defendant concluded the interview by stating that he was "sorry that [he couldn't] be of more assistance."

---

[3]It appears from the record that Wentworth's death was initially treated as a "sudden death" and that her injuries were not evident. An autopsy revealed that she had been stabbed once in the back, that she had several broken ribs, and that she had been suffocated. Her left forearm was lacerated, a wound which the medical examiner characterized as a "defense wound." The autopsy also revealed that Wentworth's blood alcohol content was 0.34 per cent, a level which the examiner noted was "extremely high." The examiner testified that the cause of death was the combined effect of the beating, stabbing, and suffocation. He also testified that Wentworth may have lived from between a few minutes to "a couple of hours" following the attack.

[4]The defendant indicated that he had sustained a cut near his left eye in a fight a week earlier. According to the defendant, he had been admitted to Leonard Morse Hospital on June 5, after the cut became infected, and he remained hospitalized for three days. Detective O'Brien testified that she did not verify whether the defendant was actually hospitalized because she "believed him."

On June 12, 1986, Detective O'Brien asked the defendant if he would be willing to go with her to the State police offices in Cambridge for questioning. The defendant agreed and they arrived at approximately 6:30 P.M., where he met with Trooper Joseph Flaherty. Flaherty read the defendant his Miranda rights, and the defendant signed a card indicating that he understood his rights, that he was voluntarily waiving them, and that he wished to speak with the police.

Trooper Flaherty commenced his interview with the defendant in a conference room that was adjacent to an open office area. In response to Flaherty's questioning, the defendant stated that he had been to Wentworth's house a month earlier to help McCall clean out the cottage, and he reiterated that he had been home in bed with an eye injury on the night of the murder. At some point during the interview, Trooper Flaherty left the room to take a telephone call. On the basis of information he received during this call, Trooper Flaherty arranged to have James Judge brought to the station for questioning.[5]

Judge arrived at the barracks at approximately 9:15 P.M., at which time Trooper Flaherty escorted the defendant out of the conference room and through the office area where Judge was standing. Judge and the defendant, who knew each other, passed within a couple of feet but did not acknowledge each other's presence. At trial, Flaherty testified that he orchestrated this encounter so that, while the two men were being interviewed in separate rooms, each would draw the inference that the other was providing the police with information.

After situating Judge and the defendant in separate rooms, Flaherty interviewed Judge for approximately fifteen minutes. He returned to the defendant and indicated that the police had information that the defendant was involved in

---

[5] The caller was a Trooper Moynihan who informed Flaherty that he had spoken with one Thomas McEwen and that McEwen had implicated James Judge and the defendant in Wentworth's murder.

Wentworth's murder.[6] The defendant denied any involvement. Subsequently, Flaherty left the room and spoke with Judge again. He then returned to the defendant, and the defendant again denied any involvement in the murder. Flaherty left the room a third time and spoke to Judge for approximately one hour. During this time, Judge confessed. Flaherty again returned to the office where the defendant was seated and, after reminding the defendant that he had been advised of his Miranda rights, informed the defendant that Judge had "made a statement." Reading from his notes, Flaherty stated that he knew that the defendant and Judge had broken into Wentworth's home to rob her, that they had been wearing masks and gloves, that they had ransacked the house looking for money the defendant believed to be located in the house, and that the defendant had yelled and screamed at Wentworth. Flaherty further stated that he knew that the two men had beaten Wentworth, that the defendant had attempted to suffocate her with a pillow, and that the defendant had retrieved a large knife from the kitchen, handed the knife to Judge, and that Judge stabbed Wentworth. As Flaherty confronted the defendant with these details of Judge's confession, the defendant sat with a sullen look and listened to what Flaherty was saying. Eventually, Flaherty informed the defendant that Judge was "taking the blame" for stabbing Wentworth. At this point, the defendant looked up and said "Well, he should, he's the one who did it." When Flaherty asked the defendant if he wanted to explain what happened, the defendant responded, "We never meant to hurt the woman." Trooper Flaherty then asked the defendant if he had "done anything" to Wentworth, and the defendant responded, "No." Finally, Flaherty asked the defendant if he had done anything to stop Judge from hurting Wentworth. The defendant responded that he had not, that

[6]At this juncture, Flaherty was acting on the basis of the information he had received during the telephone call from Trooper Moynihan, see note 5, supra. Flaherty did not disclose this to the defendant because he wanted the defendant to believe that the information had been received from Judge.

Judge was "acting crazy," and that Judge had threatened him with a knife. At this point the defendant indicated that he wished to stop the interview. Questioning ceased, and he was placed under arrest.

Dr. Vernard Adams, a medical examiner for the Commonwealth, testified as to the nature of Wentworth's injuries. Dr. Adams testified that he found numerous bruises on Wentworth's chest and abdomen, on the sides and top of her head, and on the left side of her back. Additionally, her ribs were fractured in seventeen locations. According to Dr. Adams, these injuries were consistent with Wentworth's having been beaten by two men with great force. In addition, Dr. Adams noted signs that Wentworth had been suffocated, and he observed a knife wound on the left side of her back. According to Dr. Adams, these wounds were consistent with Wentworth's having been suffocated with a pillow while simultaneously being stabbed with a "kitchen-type" knife.[7] Dr. Adams further testified that the victim had sustained a laceration to her left forearm, a wound which Dr. Adams characterized as a "defense wound." See note 3, *supra.* Finally, Dr. Adams testified that, in his opinion, all Wentworth's injuries were inflicted while she was alive and that she could have survived those injuries for several minutes to "a couple of hours."

The defendant testified as the sole defense witness. He testified that he was home in bed on June 4 as the result of an injury and that, at 2 or 3 A.M. on June 5, 1986, he was awakened by James Judge, who was holding a knife. According to the defendant, Judge was crying and kept repeating that "he never meant to hurt the woman." The defendant further testified that Judge asked him for drugs and that, when the de-

---

[7] Dr. Adams based his conclusion that Wentworth had been suffocated on the presence of petechiae, or pinpoint hemorrhages of the capillaries, in the membrane lining of the victim's eyelids and facial skin. According to Dr. Adams, petechiae are caused by high pressure in the capillaries which accompanies mechanical asphyxia, or airway obstruction. The absence of any signs of trauma on the victim's neck led Dr. Adams to conclude that the mechanical asphyxia was due to suffocation rather than strangulation.

fendant responded that he did not have any drugs, Judge threatened him with the knife and began "tearing up" the defendant's room. According to the defendant, this episode lasted approximately ten to fifteen minutes, after which Judge left.

The defendant further testified that he learned of Wentworth's murder the morning after his encounter with Judge but that he did not inform the police of that encounter because he "did not want to get involved." According to the defendant, he eventually informed Trooper Flaherty of Judge's visit to his apartment after Flaherty accused the defendant of participating in the murder. At this time, the defendant testified, he told Trooper Flaherty that Judge had come to his apartment with a knife, had threatened the defendant, and had said, "He [Judge] never meant to hurt the woman." When asked to explain Flaherty's testimony that the defendant had stated, "We never meant to hurt the woman," the defendant testified that he had said "He," not "We," and that Flaherty must have misheard him.

1. *Admissibility of Trooper Flaherty's testimony.* Trooper Flaherty testified regarding his interview with the defendant. Trooper Flaherty's testimony included references to the details of Judge's confession, including details implicating the defendant. See Appendix. The judge allowed this testimony on the theory that the defendant adopted Judge's confession by responding equivocally when confronted with Judge's statements. On appeal, the defendant raises several related challenges to Trooper Flaherty's testimony. First, the defendant argues that he did not adopt Judge's confession and that Flaherty's testimony was therefore inadmissible hearsay. The defendant further argues that the introduction of this hearsay testimony violated his Sixth Amendment right to confront his accuser. Finally, the defendant argues that the error requires that he be granted a new trial. We address each of these issues in turn.

To the extent that the defendant argues that it was error in part to admit Trooper Flaherty's testimony as to the entire statement of Judge on the ground that the defendant's re-

sponse constituted an adoptive admission, we agree with the defendant that this ruling was partially in error. "An adoptive admission is 'a statement . . . made in the hearing of another, in regard to facts affecting his [or her] rights, and [that person's] reply, wholly or partly admitting their truth." *Commonwealth* v. *Reed*, 397 Mass. 440, 442 (1986), quoting *Commonwealth* v. *Kenney*, 12 Met. 235, 237 (1847). Where a party is confronted with an accusatory statement which, under the circumstances, a reasonable person would challenge, and the party remains silent or responds equivocally, the accusation and the reply may be admissible on the theory that the party's response amounts to an admission of the truth of the accusation. See, e.g., *Commonwealth* v. *Jones*, 400 Mass. 544, 547 (1987); *Commonwealth* v. *Brown*, 394 Mass. 510, 515-516 (1985). See also P.J. Liacos, Massachusetts Evidence 287-289 (5th ed. 1981 & Supp. 1985). Evidence of this nature is to be received with caution, especially in criminal cases, due to the fact that the meaning of a defendant's response, or lack thereof, to an accusatory statement is often ambiguous. See *Commonwealth* v. *Brown*, *supra* at 515; *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 316 (1973), *S.C.*, 391 Mass. 123 (1984); *Commonwealth* v. *Boris*, 317 Mass. 309, 317 (1944). Indeed, we have previously expressed our "general wariness of adoptive admissions." *Commonwealth* v. *Rembiszewski*, *supra* at 316.

In the present case, we are faced with the question whether the defendant responded to Trooper Flaherty's accusatory statements in such a manner as to adopt all the details of the confession of James Judge. Having reviewed the relevant testimony, we think it clear that the defendant did not adopt all those details. The defendant's statement, "We never meant to hurt the woman," may be viewed as a response adopting the essence of Judge's accusations, namely, that the defendant was present and participated in the commission of this homicide. It is true, however, that this statement must be viewed in context with the defendant's further statements that he himself had not done anything to Wentworth and that he had not stopped Judge, because

Judge was "acting crazy" and had threatened him with a knife. See *Commonwealth* v. *Cunningham*, 405 Mass. 646, 652 (1989). Viewing the defendant's response in this context, we think it clear that the defendant did not adopt Judge's entire account of what transpired at Wentworth's home.[8]

Although we agree with the defendant that Trooper Flaherty's testimony as to Judge's statement was not admissible as an adoptive admission of all that statement, this does not require the further conclusion that Trooper Flaherty's testimony was wholly inadmissible. During his interview with Flaherty, the defendant made several statements that were directly admissible against him as admissions, rather than as adoptive admissions. *Commonwealth* v. *Walden*, 380 Mass. 724, 731-732 (1980). *Commonwealth* v. *Bonomi*, 335 Mass. 327, 347 (1957). Thus, the testimony that the defendant had stated, "We never meant to hurt the woman," that he had stated that Judge properly had taken the blame for stabbing Wentworth because "he's the one who did it," and the testimony regarding the defendant's other affirmative statements

---

[8]Similarly, we do not view the defendant's silence during the course of Flaherty's accusation as amounting to an admission by silence. Cf. *Commonwealth* v. *Simpson*, 370 Mass. 119, 123 (1976). Several factors counsel against construing the defendant's silence as an admission. First, in the course of confronting the defendant with the details of Judge's confession, Trooper Flaherty did not pause after each substantive accusation and then await the defendant's response. Rather, Flaherty read the defendant a continuous series of accusations, and the defendant simply failed to interrupt Flaherty as he spoke. Second, the defendant previously had denied Flaherty's accusations, including one detailed accusation, on at least two occasions. Thus, the defendant's silence simply may have reflected his belief that he had already denied sufficiently Flaherty's accusations. See *Refrigeration Discount Corp.* v. *Catino*, 330 Mass. 230, 238 (1953); P.J. Liacos, *supra* at 288. Third, the defendant's silence came during a custodial interrogation during which he had been advised of his right to remain silent. In such circumstances, a defendant's silence is "insolubly ambiguous," *Doyle* v. *Ohio*, 426 U.S. 610, 617 (1976), because it may reflect the defendant's reluctance to make an affirmative statement that would later be used to his or her detriment. See *id.*; *United States* v. *Hale*, 422 U.S. 171, 176-177 (1975); *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 316 (1973). Finally, the adverse use of a defendant's silence following the issuance of Miranda warnings raises serious constitutional questions, see *Doyle* v. *Ohio, supra.*

was admissible on the ground that those statements constituted admissions by the defendant which, when coupled with other evidence, tended to establish guilt. *Commonwealth* v. *Walden, supra.* Further, the Commonwealth was entitled to place the defendant's admissions in context by introducing testimony as to what prompted the defendant's statements. See *United States* v. *Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988), cert. denied sub nom. *Slaughter* v. *United States*, 490 U.S. 1074 (1989). Thus, only those aspects of Trooper Flaherty's testimony that were attributable to James Judge, that implicated the defendant in the crime, and that the defendant did not affirmatively adopt were inadmissible. These statements were hearsay which contravened the defendant's Sixth Amendment right to confront the witnesses against him. *Douglas* v. *Alabama*, 380 U.S. 415 (1964). Cf. *Commonwealth* v. *Jones*, 400 Mass. 544, 547 (1987) (no confrontation clause violation where accomplice's statements admitted as adoptive admission); *Commonwealth* v. *Brown*, 394 Mass. 510, 515 (1985) (same). Accordingly, in the face of a proper objection, the testimony relating the details of Judge's confession should have been excluded.

We note, however, that the defendant did not raise a proper objection to Trooper Flaherty's testimony. The defendant's sole objection to Flaherty's testimony came during a voir dire conference which was held before Flaherty took the stand.[9] During the voir dire, the Commonwealth made an offer of proof as to how Flaherty would testify. The judge then asked defense counsel for his views on the evidence, and defense counsel placed his objection "on the record." Defense counsel went on to concede, however, that, "in reading [the Commonwealth's] memorandum, there seems to be some responsibility on the part of the defendant to answer in an unequivocal manner." Having virtually conceded the admissibility of the testimony, defense counsel further stated, "I think a lot of my fire will have to go to the weight of this evi-

---

[9]The voir dire was held on the second day of trial; Trooper Flaherty testified on the fourth day of trial.

dence." This objection was wholly insufficient to raise the defendant's present claims of error. The defendant did not argue that his response to Flaherty's accusations was anything other than equivocal, nor did he distinguish between the admissible and inadmissible aspects of Trooper Flaherty's testimony. See *Bryer* v. *P.S. Thorsen Co.*, 327 Mass. 684, 686-687 (1951). See also P.J. Liacos, Massachusetts Evidence, *supra* at 73. Moreover, the defendant did not raise any constitutional claim. Rather, after placing an objection on the record, defense counsel went on virtually to concede the admissibility of the evidence. In these circumstances, the defendant's objection was essentially form over substance; there was no request that the Trooper's testimony be redacted. Thus, we conclude that the defendant did not preserve his present claims of error for review.[10] Accordingly, our review is limited to whether the error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Dias*, 405 Mass. 131, 137-138 (1989).[11]

We believe that the improper aspects of Trooper Flaherty's testimony created no substantial likelihood that justice was not carried out. The properly admitted evidence against the defendant was overwhelming that he was present at the scene of the murder. The defendant's own statements to Trooper Flaherty that "[w]e never meant to hurt the woman," and

---

[10]Although we do not rely on it, we note that, in the context of his claim that he was denied effective assistance of counsel at trial, the defendant concedes that his trial counsel did not object to Trooper Flaherty's testimony.

[11]The United States Supreme Court has held that a confrontation clause violation does not require reversal of a conviction where the error is harmless beyond a reasonable doubt. See, e.g., *Brown* v. *United States*, 411 U.S. 223 (1973); *Schneble* v. *Florida*, 405 U.S. 427, 432 (1972). In applying this standard, the Court has considered a number of factors, including the importance of the evidence in the prosecution's case, whether the improper testimony was cumulative of other evidence, the extent of cross-examination permitted, and whether the other evidence against the defendant was overwhelming. See *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684 (1986). See also *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 n.8 (1987). We are guided by similar considerations. See *Commonwealth* v. *Dias*, 405 Mass. 131, 137-138 (1989).

that he had not stopped Judge from harming her because Judge was "acting crazy" were themselves sufficient to place the defendant at the murder scene. Moreover, this evidence was buttressed by the evidence that, although Wentworth's house was completely ransacked on the night of the murder, the three boxes which the defendant had delivered to Wentworth's house a month earlier were left undisturbed on the night of the murder. Similarly, the evidence that Wentworth's pill containers, in which the defendant had previously expressed an interest, were found strewn about in Wentworth's home, although not conclusive, was additional evidence that also pointed to the defendant's presence at the scene. In these circumstances, any hearsay aspect of Flaherty's testimony which placed the defendant at the scene of the crime was cumulative.

Similarly, as to those aspects of Flaherty's testimony detailing the manner in which Wentworth was killed, we note that much of this testimony was cumulative of the testimony of the medical examiner, Dr. Adams. Specifically, Dr. Adams's testimony that the victim had been beaten, stabbed, and suffocated provided a basis on which the Commonwealth could prove its case in a way independent of Trooper Flaherty's testimony. Accordingly, Trooper Flaherty's testimony in this regard did not create a substantial likelihood of a miscarriage of justice.

Finally, as to those aspects of Trooper Flaherty's testimony implicating the defendant as a participant in the murder — such as the testimony that the defendant had retrieved the knife, had beaten the victim, and had held a pillow to her face — we conclude that this testimony, although damaging, does not require reversal. See *Commonwealth* v. *Libran*, 405 Mass. 634, 642-644 (1989). Cf. *Commonwealth* v. *Johnson*, 412 Mass. 318, 324 (1992); *Commonwealth* v. *Dias*, *supra*. The defendant contends that this testimony was the only evidence establishing his complicity in the murder and that, without these inadmissible details of Judge's confession, the evidence would have been sufficient only to establish that the defendant was present at the scene of the crime and that he

was agreeable to a burglary. This argument overlooks, however, that the medical evidence introduced by the Commonwealth established that Wentworth's fatal injuries were consistent with having been stabbed by one person while being suffocated by another and that her numerous bruises and broken ribs were consistent with having been beaten by two men. When that evidence is considered in conjunction with the defendant's own statement that "[w]e never meant to hurt the woman" (emphasis supplied), Trooper Flaherty's testimony as to which of the victim's injuries were directly attributable to the defendant becomes unimportant. This is not a case where the Commonwealth's "best evidence tended to prove 'that at least one . . . but not necessarily both of them, robbed and killed [the victim].' " *Commonwealth v. Sinnott*, 399 Mass. 863, 874-875 (1987), quoting *Commonwealth v. Moran*, 387 Mass. 644, 659 (1982). Rather, the admissible evidence tended to prove that both men played a role in inflicting the fatal injuries. See *Commonwealth v. Sinnott, supra* at 873. Further, based on this evidence that both men were involved, the jury could properly infer that the defendant possessed the requisite intent necessary to convict him of participating in a joint venture to commit murder with extreme atrocity or cruelty. See *id.* In these circumstances, the inadmissible testimony as to which of the victim's injuries were inflicted by the defendant was not crucial to the Commonwealth's case. See *Commonwealth v. Libran, supra* at 643-644. Accordingly, we conclude that the erroneous admission of this testimony did not create a substantial likelihood of a miscarriage of justice.[12]

---

[12]For essentially the same reasons, we conclude that the judge properly denied the defendant's motion for a required finding of not guilty. As we have already determined, the evidence, viewed in the light most favorable to the Commonwealth, see *Commonwealth v. Walker*, 401 Mass. 338, 339-341 (1987), was sufficient to implicate the defendant as a participant in the beating of the victim and thus to warrant his conviction either on the theory that he acted as a principal in the murder or that he acted as a joint venturer. Additionally, the evidence that the victim, a sixty-two year old woman, was beaten repeatedly about the head and chest, was stabbed in the back and in the forearm, was suffocated, and was then left to die

2. *The defendant's Miranda claims.* For the first time on appeal, the defendant challenges as violative of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), Trooper Flaherty's testimony that: (1) the defendant failed to acknowledge James Judge at the State police offices; (2) the defendant remained silent as Flaherty confronted him with the details of Judge's confession and (3) the defendant ultimately responded, "We never meant to hurt the woman."[13] The defendant's challenge to this testimony is twofold. First, relying on *Rhode Island* v. *Innis*, 446 U.S. 291 (1980), and *Commonwealth* v. *Brant*, 380 Mass. 876 (1980), the defendant claims that Flaherty's actions in walking the defendant past James Judge and then later confronting the defendant with Judge's confession were improper because they reflected an "explicit strategy, undertaken for the express purpose of evoking a confession." Second, the defendant argues that admission of testimony that he had remained silent during each of these encounters was improper.

To the extent that the defendant argues that his Miranda rights were violated because Trooper Flaherty employed tactics intended to elicit a response, his reliance on *Innis* and *Brant* is misplaced. *Innis* and *Brant* each involved a situation where a defendant had invoked his right to remain silent and where the officers involved thereafter proceeded to take actions which they reasonably should have known were likely to elicit a response from the defendant. In each case, the evidence thus obtained was held inadmissible because the defendant's invocation of his Miranda rights was not "scrupulously honored" by the officers. In the present case, however, the evidence indicates that the defendant waived his Miranda rights and indicated his willingness to talk with the police.

from her injuries, certainly warranted a finding that the murder was committed with extreme atrocity or cruelty. *Commonwealth* v. *Lacy*, 371 Mass. 363, 368 (1976). In light of this conclusion, we need not consider whether the evidence was also sufficient to warrant the conviction of felony-murder.

[13]The defendant filed no motion to suppress prior to trial, nor did he object to Flaherty's testimony at trial on Miranda grounds.

He did not invoke his right to remain silent until after the events of which he now complains. Therefore, it was not improper for the officers to attempt, within proper bounds,[14] to elicit a confession from the defendant. Thus, the defendant's claim in this regard must fail.

As to the defendant's claim regarding the testimony that the defendant remained silent during portions of his interview with Trooper Flaherty, we perceive no Miranda violation. There is nothing in the record to suggest that the defendant had invoked his right to remain silent and thus the testimony cannot be construed as an impermissible comment on the defendant's having invoked that right. As to the evidence that the defendant lowered his head as he was escorted past James Judge at the police barracks, we fail to see how this testimony violated the defendant's rights. Although we agree with the defendant that he had no duty to acknowledge James Judge, any conflicting inferences to be drawn from the defendant's conduct were for the jury to resolve. See *Commonwealth* v. *Scanlon*, 412 Mass. 664, 677 (1992), and cases cited.

3. *Evidence obtained without a warrant.* Following the defendant's arrest, the defendant's sister, Kim MacKenzie Todd, and her husband, Detective Charles Todd of the Holliston police, retrieved five paper bags belonging to the defendant from a room which the defendant had been using at his mother's Holliston home. Kim and Charles Todd also retrieved a pair of workboots belonging to the defendant from a shed that was adjacent to his mother's house. Subsequently, Charles Todd turned these items over to the Wayland police. The Commonwealth introduced in evidence the workboots and some cosmetics boxes, coins, and jewelry belonging to Wentworth that were among the items contained in the paper bags. The defendant now claims that these items were seized in violation of his rights under the Fourth

---

[14]The defendant did not argue below, nor does he now contend, that his statements were coerced or otherwise made involuntarily.

Amendment to the United States Constitution and thus were admitted improperly at trial.

The defendant did not move to suppress the contested evidence before trial. He did not argue at trial that the evidence was obtained unlawfully.[15] Thus, the question of the legality of the search, assuming a search occurred,[16] is not before this court on appeal except as we review the issue under G. L. c. 278, § 33E. *Commonwealth* v. *Shine*, 398 Mass. 641, 652-653 (1986). Even if we were to assume that an improper seizure occurred, there would be no reason to afford the defendant relief under G. L. c. 278, § 33E. There was no testimony at trial linking the defendant's boots to the crime, nor was there any evidence to cast into doubt the defendant's own testimony that he had taken the other items in question from Wentworth's cottage a month prior to the murder. Indeed, elsewhere in his brief, the defendant characterizes this very evidence as "barely incriminating." We agree with that characterization.

4. *The prosecutor's remarks.* The defendant contends that the prosecutor asked him several improper questions during cross-examination. The defendant did not object to any of the questions, and thus our review is limited to whether the allegedly improper questions created a substantial likelihood of a miscarriage of justice.

The first question challenged by the defendant, in which he claims the prosecutor asked the defendant to comment on

---

[15]The defendant's sole objection was to the relevancy of the boots. This objection was sustained and the boots were initially excluded. Subsequently, after the defendant identified the boots as his own, the Commonwealth was permitted to introduce the boots in evidence.

[16]It is not clear that Charles Todd was acting in his capacity as a police officer at the time he retrieved the items from his mother-in-law's house. Todd testified that he removed the items after his wife directed him to "[g]et them out of here." Moreover, even if we were to assume that Todd was acting in his capacity as a police officer, the record suggests that he had consent to enter the premises. It is well established that "a search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 222 (1973).

the credibility of Trooper Flaherty,[17] was clearly improper. It is a fundamental principle that a witness cannot be asked to assess the credibility of another witness. *Commonwealth* v. *Elam*, 412 Mass. 583, 586 (1992). We do not believe, however, that the error created a substantial likelihood of a miscarriage of justice. The nature of the question was not such that the defendant's only option was to characterize Trooper Flaherty's testimony as either truthful or false and, more importantly, the defendant was able to respond without making such a characterization. See *id.*; *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400, 402 (1983). In view of the defendant's response, we do not think it likely that the jury were led to believe that the variation in the witnesses' testimony "could only be the result of lying and not because of misrecollection, failure of recollection or other innocent reason." *Commonwealth* v. *Ward*, *supra*, quoting *United States* v. *Narciso*, 446 F. Supp. 252, 321 (E.D. Mich. 1977).

The defendant next challenges a series of questions posed by the prosecutor pertaining to the defendant's failure to call alibi witnesses. The substance of most of these questions was whether the defendant's housemates were available to testify and whether they could corroborate the defendant's testimony that he was home in bed on the night of the murder. There was no error. "Generally, a defendant's failure to call witnesses to support his explanation of events is a 'fair matter for comment . . .' if there is some foundation that witnesses other than the defendant were available for that pur-

---

[17]The prosecutor cross-examined the defendant as follows:

THE PROSECUTOR: "Isn't it a fact . . . that you were brought out of that conference room and walked through that State Police Office at the same time Jimmy Judge was walked right past you, an arm's length away, as you were moved to that new office and he was put where you had been."

THE DEFENDANT: "No sir, that's not true. I did not see Mr. Judge until we were charged."

THE PROSECUTOR: "Trooper Flaherty fabricated that?"

THE DEFENDANT: "I certainly did not see Mr. Judge."

THE PROSECUTOR: "Didn't you walk by him with your head down?"

THE DEFENDANT: "After the interview was concluded and charges were brought against me."

pose." *Commonwealth v. Cancel,* 394 Mass. 567, 575 (1985), quoting *Commonwealth v. Domanski,* 332 Mass. 66, 70-71 (1954). See *Commonwealth v. Franklin,* 366 Mass. 284, 292 (1974). In the present case, we agree with the Commonwealth that the challenged questions simply reflect the prosecutor's attempt to lay the necessary foundation for a subsequent comment on the absence of alibi witnesses. See *Commonwealth v. Cancel, supra.* In this regard, we note that the prosecutor did not press the issue after the defendant indicated that one of his witnesses was unavailable. Furthermore, any potential prejudice that arose from the questioning was alleviated by the judge's charge that the defendant did not have a duty to call any witnesses on his own behalf.

Finally, the defendant argues that the prosecutor improperly asked him to explain what reason James Judge would have for implicating the defendant in the murder. We doubt the question was improper. Additionally, we fail to see how the question was any more damaging to the defendant than the testimony of Trooper Flaherty to which the question related. We already have concluded that the inadmissible portions of Trooper Flaherty's testimony did not create a substantial likelihood of a miscarriage of justice, and we reach the same conclusion with regard to the question challenged here.

5. *The absence of a jury instruction on the lesser included offense of burglary.* The defendant argues that the trial judge erred in failing to instruct the jury that they could convict the defendant of the lesser included offense of burglary on the indictment charging him with armed burglary with assault. The defendant argues that the absence of such a charge, which was not requested at trial, created a substantial likelihood of a miscarriage of justice because it prevented the jury from considering returning a verdict of guilty of murder in the second degree rather than felony-murder in the first degree. See *Commonwealth v. White,* 353 Mass. 409, 424-425 (1967). The short answer to this argument is that the defendant also was convicted of murder committed with extreme cruelty or atrocity. Thus, the error, if any, in

the judge's charge on burglary or felony-murder was harmless.[18]

6. *Ineffective assistance of counsel.* The defendant argues that his trial counsel's failure to move to suppress the evidence seized from the defendant's mother's home, to object to Trooper Flaherty's testimony regarding the statement of James Judge, and to object to testimony that the defendant remained silent at various times during his interview with Trooper Flaherty deprived him of the effective assistance of counsel. In reviewing such claims of ineffective assistance of counsel, we have stated that our inquiry is "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). In a capital case, however, we review such claims pursuant to G. L. c. 278, § 33E, a standard of review that is even more favorable to the defendant. Under that standard of review, we do not focus on the adequacy of trial counsel's performance. Rather, we consider "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). In short, under this broader standard of review, we review a defendant's claim even if the alleged error on the part of trial counsel does not constitute conduct falling "measurably below" that of "an ordinary fallible lawyer."

Applying this standard, we need not dwell long on the defendant's claims that his counsel was ineffective. As we have

[18]Further, we note that, in the course of instructing the jury on the elements or armed burglary with assault, the judge did in fact instruct the jury regarding the lesser included offense of burglary. The jury returned a guilty verdict on the armed burglary indictment, thus suggesting that an instruction on murder in the second degree would have been of little help to the defendant.

already noted, the error, if any, resulting from trial counsel's failure to move to suppress the evidence seized from the defendant's mother's home, did not deprive the defendant of an otherwise available defense, as the evidence in question was never linked to the crime. Similarly, although trial counsel's failure to object to Trooper Flaherty's testimony resulted in otherwise inadmissible evidence having been admitted in evidence, we conclude that, in light of the fact that most of Trooper Flaherty's testimony was otherwise admissible, and in light of the other admissible evidence linking the defendant to the murder, the defendant's claims of ineffective assistance of counsel add nothing new to the analysis we have already undertaken under G. L. c. 278, § 33E. See *Commonwealth* v. *Elam*, 412 Mass. 583, 588 (1992).

7. *Review under G. L. c. 278, § 33E.* We have reviewed the case on the law and the facts pursuant to our duty under G. L. c. 278, §`33E, and see no reason to exercise our power to order a new trial or, as to the murder conviction, to reduce the verdict.

*Judgments affirmed.*

APPENDIX.

Trooper Flaherty testified in relevant part as follows:

THE WITNESS: "I told him — I said that 'I know that you and James Judge broke into [the victim's] home, we know you went in there to rob her, we know that you had masks and gloves on, we also know that you ransacked the house looking for. the money, that you were yelling and screaming at her.' "

THE PROSECUTOR: "Did you tell him any particulars about what their motive was for going in there?"

THE WITNESS: "Yes."

THE PROSECUTOR: "What was that?"

THE WITNESS: "That they believed that —"

THE PROSECUTOR: "Who is they?"

THE WITNESS: "That [the defendant] actually believed that there was two or three thousand dollars in cash in [the victim's] home."

THE PROSECUTOR: "Did you say that specifically to [the defendant], that he was the one who had thought that she had that money there?"

THE WITNESS: "Yes."

THE PROSECUTOR: "As you made these statements to him, that he had broken in there and was wearing the mask and the motive was the money, what was his demeanor at that time?"

THE WITNESS: "Very sullen. He just kind of sat back and looked, didn't say anything. He just really kind of listened to what I was saying."

THE PROSECUTOR: "Were you going detail by detail?"

THE WITNESS: "Yes, sir."

THE PROSECUTOR: "After telling him the detail of the motivation for going in there, what was the next thing that you told him Judge had said?"

THE WITNESS: "I told him that Judge was taking the blame for stabbing [the victim]. At that time [the defendant] looked up and said, 'Well, he should, he's the one who did it.' "

THE PROSECUTOR: "Prior to that did you give [the defendant] any more details about what he had done in the house?"

THE WITNESS: "Yes."

THE PROSECUTOR: "What was that?"

THE WITNESS: "That [the defendant] had taken a pillow and started suffocating [the victim], that he had come out of the kitchen with a large knife, had given it to Mr. Judge, and that as [the defendant] was suffocating the woman with the pillow, Mr. Judge had taken the knife and plunged it into [the victim]."

THE PROSECUTOR: "Did the statement indicate whether [the victim] had been beaten prior to this?"

THE WITNESS: "Yes."

THE PROSECUTOR: "What was that?"

THE WITNESS: "That in fact she was beaten during this ordeal and that —"

THE PROSECUTOR: "In what manner?"

THE WITNESS: "She had suffered nine broken ribs."

THE PROSECUTOR: "And by what was she beaten? By a fist or with an instrument or what?"

THE WITNESS: "I believe it was fists."

THE PROSECUTOR: "After you told this to [the defendant] and the part that Judge was taking the blame for the stabbing part of it, what, if anything did he say?"

THE WITNESS: "Again, he said that — when I told him that Mr. Judge was taking the blame for stabbing the woman, he said, 'Well, he should, he's the one who did it.' And I said, 'Well do you want to tell me what happened?' And he said, 'We never meant to hurt the woman.' "

THE PROSECUTOR: "Did he do some physical gesture after he said, 'He should take the blame, he did it,' and before he told you 'We never meant to hurt the' —"

THE WITNESS: "Yes."

THE PROSECUTOR: "What did he do?"

THE WITNESS: "Put his head in his hands."

THE PROSECUTOR: "Can you show us how [the defendant] looked when he said that? Or, when he did that, rather."

THE WITNESS: "He was sitting in a chair, and I was telling him what was going on, and he was going similar to this (DEMONSTRATING), just listening to what I was saying. And when I said to him about Mr. Judge taking the blame for stabbing her, he said, 'Well, he should, he's the one who did it,' and then just kind of put his head in his hands again and said he never meant to hurt the woman."

THE PROSECUTOR: "What was the next thing you said to him?"

THE WITNESS: "I asked him if he had done anything to [the victim], and he said, 'No.' I then asked him if he had done anything to stop Mr. Judge from doing anything to [the victim], and he said, 'No, that Mr. Judge was acting crazy and that he threatened me with a knife.'"

THE PROSECUTOR: "Threatened whom with a knife?"

THE WITNESS: "Threatened [the defendant] with a knife."