## COMMONWEALTH *vs.* EDWARD K. BOYER
### (and a companion case[1]).

No. 99-P-1033.

Bristol. December 7, 2000. - September 24, 2001.

Present: ARMSTRONG, C.J., KAPLAN, & GREENBERG, JJ.

*Attorney at Law. Bribery. Intimidation of Witness. Witness,* Intimidation. *Practice, Criminal,* Motion in limine, Severance. *Evidence,* Hearsay, Admission by silence, Pattern of conduct, Statement of codefendant.

At a criminal trial involving two codefendants, the testimony of a witness regarding statements made by one codefendant was admissible against the other defendant, where the testimony was probative of a common plan or scheme to interfere with witnesses, and where the testimony involved an incident that took place within three months of the acts for which the defendants stood trial and thus was timely. [596-597]

At a criminal trial involving two codefendants, the testimony of a witness regarding statements made by one codefendant did not require severance of the other codefendant's trial or redaction of any reference to the other codefendant from the testimony, where the statements were admissible against that other codefendant as statements made by a joint criminal venturer. [597-598]

At a criminal trial, portions of a defendant's grand jury testimony showing that the defendant chose not to speak with a witness did not constitute an admission by silence and should not have been admitted into evidence, but the error was not prejudicial, given the other testimony as to the defendant's guilt that was properly admitted. [598-600]

At a criminal trial, the testimony of a witness involving an incident that took place over two months after the acts for which the defendant stood trial was admissible, where the testimony described similar conduct that was inextricably linked to the events which gave rise to the charges against the defendant, and where any prejudicial effect of the testimony was ameliorated by a limiting instruction that informed the jury not to consider the testimony as indicative of bad character or a propensity to commit crimes. [600]

At a criminal trial involving codefendants, the admission of a portion of one codefendant's grand jury testimony did not violate the other codefendant's right to confrontation, where the testimony was not facially incriminating,

[1]Commonwealth *vs.* Pedro Cumba, Jr. We employ the use of "Jr." because it appears on the indictment, even though the defendant refers to himself as Pedro Cumba in other court documents.

and where the trial judge cautioned the jury to use the evidence only against the one codefendant and not the other. [601-602]


INDICTMENTS found and returned in the Superior Court Department on August 12, 1996.

The cases were tried before *Charles J. Hely*, J.

*Dana Alan Curhan* for Edward K. Boyer.

*David J. Dubinsky* for Pedro Cumba, Jr.

*Susanne Levsen Reardon*, Assistant Attorney General, for the Commonwealth.

GREENBERG, J. Edward K. Boyer, an attorney, and Pedro Cumba, Jr., his assistant and driver, were indicted by a Bristol County grand jury for two counts of interference with a witness, G. L. c. 268, § 13B, and two counts of bribery, G. L. c. 268A, § 2(*c*), alleged to have been committed between May and November 1995. Trial was to be joint. On January 31, 1997, Boyer moved for a separate trial on the bribery and interference indictments. Then, on June 4, 1997, Boyer joined in Cumba, Jr.'s motion to sever their cases. A week later, a Superior Court judge denied both of their motions. Trial proceeded before a jury and a different judge on December 15, 1997. The jury returned a verdict of guilty on all four counts against Boyer. Cumba, Jr. was acquitted on one count each of bribery and witness interference and found guilty on the remaining two counts. From the judgments of conviction the defendants take their appeals.

We recite the facts as the jury could have found them, reserving certain facts for discussion in connection with specific issues raised on appeal. In 1994, Pamela Gauvin, an assistant district attorney in Bristol County, tried about forty criminal cases at the Fall River District Court on Rock Street. The defendant, Edward K. Boyer, a local defense attorney, regularly appeared on behalf of clients whose cases were before the same court, handling assignments, motions, and probable cause hearings, as well as trials. According to Gauvin, Boyer frequently drove to and from the courthouse in a black Lincoln Continental. Toward the end of that year, Gauvin noticed the defendant, Cumba, Jr., driving the same vehicle, dropping Boyer off at the

entrance to the courthouse, and picking him up when court adjourned. Cumba, Jr. would wait for Boyer in an adjacent alleyway.

On other occasions, Cumba, Jr. would accompany Boyer inside the courthouse while various proceedings involving Boyer's clients were going on. Cumba, Jr. would converse with Boyer in the courtroom between conferences or arguments on matters in which Boyer had been engaged as defense counsel. Gauvin observed this type of interaction four or five times weekly in the latter part of 1994. The same type of interaction continued during the events at issue in these cases.

If a percipient witness in any case did not appear, the prosecution's case might be severely hampered. In such instances, Gauvin would try to locate the missing witness. If unsuccessful, and if the case could not be proved through other witnesses' testimony, Gauvin would attempt to negotiate a plea or move for dismissal. In such instances, Gauvin would offer a less stringent sentence than if the case were fully triable. At dispositional hearings, if the victim did not appear, Gauvin's sentence recommendations were generally light. Two cases assigned to Gauvin in 1995, in which Boyer figured as defense counsel, fell into this pattern.

The first case involved a defendant named Richard DaSilva, charged with rape, kidnapping, and stealing of property of a thirty-five year old woman whom we shall call Faith. Boyer filed an appearance in this case on May 19, 1995. Four days later, Faith herself was arrested and arraigned on unarmed robbery charges. Over the summer of that year, DaSilva was charged on three additional sexual assaults involving four different victims. After pleas of not guilty were entered, Boyer, as DaSilva's lawyer, shifted ground: the problem could be solved, short of trial, by persuading the women not to cooperate with the prosecutor.

Twenty-five year old Shelley Picard lived with her mother in Fall River. Picard ran with the same crowd as Faith and knew Cumba, Jr. through his girlfriend. In May 1995, Cumba, Jr. visited Picard's house. Did she know Faith? Picard replied in the affirmative. Would she like to make some money by persuading Faith to drop the charges against DaSilva? Cumba, Jr.

explained that he would get the money from Boyer. Picard wanted to hear this proposition directly from Boyer, so Cumba, Jr. and Picard drove to the New Bedford District Court. Cumba, Jr. parked his car in front of the district attorney's office and went into the courthouse, returning two minutes later with Boyer.

Cumba, Jr. told Boyer that Picard was the one who was going to talk to Faith about dropping the charges. Standing next to Cumba, Jr.'s car, Boyer said to Picard, "Don't do anything to get yourself in trouble and intimidate her in any way." Picard replied that she would not but offered to approach Faith and talk with her. As Picard got back inside the car with Cumba, Jr., she queried him about payment. Cumba, Jr. yelled to Boyer, "Eddie, won't you take care of her?" Boyer, who was headed back to court, turned around and said, "You know that I'm a man of my word."

DaSilva was due back in court on the Faith case on May 26. By then, Picard had put the proposition to Faith. Faith agreed to drop the charges but wanted at least $1,500 to get some belongings out of storage. Picard called Cumba, Jr. and conveyed Faith's demand. Cumba, Jr. said, "Tell her all right. Whatever she wants."

What Picard and Cumba, Jr. did not know was that Faith had become upset after the conversation with Picard and had told her mother what had transpired. After making a call to the Fall River police, Faith met with a number of police officers. The police devised a plan involving Faith asking for an additional $500. A sting operation was set up at the Fall River District Court for May 26, 1995. At the courthouse, police officer Scott Warmington positioned himself near the side entrance near a woman he believed to be Picard. One officer was operating a video camera from a surveillance van parked nearby. Faith went up to Picard and demanded $500 up front before speaking to the prosecution about dropping the charges. Picard became upset and visibly agitated, arguing that they already had an agreement and that Faith would have to drop the charges first. Picard insisted that Boyer was to be trusted. At this point, Warmington noticed the black Lincoln Town Car parked across the street with Cumba, Jr. in the driver's seat. Warmington watched

as Picard approached the car, spoke to Cumba, Jr., and then returned to try again to convince Faith to go through with the deal. Faith, using a loud tone of voice so that the dialogue would be overheard by the undercover officers, was steadfast about advance payment.

Cumba, Jr. drove the Lincoln around the corner and parked directly in back of the surveillance van. Picard walked over, spoke to Cumba, Jr., and then again approached Faith. Picard said that she had seen the money, and urged Faith to go inside and speak to the prosecutor. At that juncture, Boyer emerged from the District Attorney's office and shouted loudly enough to get Picard's attention. Boyer said that if there was a problem, he would get another court date. Both Boyer and Faith went inside the courthouse, trailed by Warmington. He heard Boyer state "She wants . . . ," but did not pick up the rest of the remark. When Warmington learned from Faith that no cash had passed, he instructed her to go back inside and tell Picard that the deal was off. As Faith left, Warmington approached Picard and tried to engage her in casual conversation. Picard appeared agitated and had nothing more to say.

Several times during the summer of 1995, the police body-wired Faith with instructions to engage Boyer and Cumba in further conversation about the deal. Nothing came of those plans. A probable cause hearing on the charges that involved Faith's rape was eventually held on November 8, 1995. For reasons not apparent from the record, DaSilva was never indicted.

The second case involved a client of Boyer's named Brian Silva who was one of two suspects in the robbery of twenty-four year old Lynn Pacheco. During the summer, at various court proceedings, Pacheco recognized Boyer, who had previously represented Pacheco's husband and was friendly with her. On August 30, 1995, after court, Pacheco stopped by a friend's house. Boyer's black Lincoln was parked in front, and Pacheco found Boyer inside talking with the friend. Boyer addressed Pacheco directly, saying that he did not want Silva to go to jail, and that Silva's parents had given Boyer $10,000 to keep Silva out of jail. Boyer then handed a $100 bill to Pacheco's friend and said, "You know who this is for. I can't indirectly [*sic*]

hand it to her." That said, Boyer handed Pacheco his business card, asking Pacheco to call him in a week and stating that she would be paid between $500 and $1,000. In the fall, after receiving a summons to appear in court on September 8, 1995, Pacheco called Boyer, who told her not to worry and not to show up. At Boyer's office later that same day, he offered Pacheco a check for her troubles. Pacheco wanted cash. On that day, the probable cause hearing on the complaint against Silva was scheduled, but Pacheco failed to appear. As a result, Gauvin called from the courthouse to say that the parties had worked out an agreed disposition with no jail time, but permitting the District Court to maintain jurisdiction. Pacheco was satisfied. Three days later, Pacheco met Boyer at his office. Boyer handed Pacheco $200 in cash and indicated that the balance of the payoff would be delivered to her house. A few days later, Cumba, Jr. drove to Pacheco's house in the black Lincoln and handed her a white envelope with another $200 cash payment inside.

It remains to mention the defendants' evidence. Neither defendant testified, but through other witnesses, one of whom was Boyer's law partner, Carlton Abbott, Faith was described as angry because Abbott had refused to advance her money in a pending personal injury case involving Faith's boyfriend. According to Abbott, Faith also asked him to represent her on a pending heroin distribution charge. When Abbott explained that Boyer, his partner, was representing DaSilva on the rape case which Faith had brought, Boyer emerged from his office and confirmed the conflict of interest. Faith became visibly angry. Several months before the law office meeting, Abbott had been at Faith's boyfriend's apartment. Faith had mentioned a pending disorderly person charge and had told Abbott of a strategy to get the charges dropped by filing a harassment complaint against the arresting officers. Abbott painted a picture of Faith as manipulative and vindictive.

As far as the Pacheco case was concerned, the defendants unsuccessfully tried to show that the money Boyer offered was not in exchange for skipping court appearances. There was some slight discrepancy in the amount of money Pacheco claimed to have received. Defense counsel examined police wit-

nesses in an effort to show that favorable treatment was offered to Pacheco in regard to several pending charges against her in exchange for Pacheco's testimony in the defendants' trial.

1. *Boyer's appeal.* The prosecutor moved in limine for advance rulings by the judge as to the prospective use by the Commonwealth of testimony of a woman whom we shall call Jessica as a proof of a common pattern or scheme. Ultimately permitted to testify, Jessica stated that in 1995 she was taken by DaSilva, against her will, from Fall River to Tiverton, Rhode Island, where he raped her. Kidnapping charges were pending in Massachusetts and a rape charge in Rhode Island. On August 6, 1995, Jessica met Cumba, Jr. at a Store 24. Cumba, Jr. asked if Jessica would consider dropping the charges against DaSilva. Cumba, Jr. said that he was working for Boyer, who represented DaSilva, and that DaSilva's family would do anything to avoid his going to jail. There would be money in it for Jessica. Cumba, Jr. stated, "We would be willing to pay $1,000 for you to drop the charges." Jessica, like Faith, was upset, especially when Cumba, Jr. said, "Weren't you out trying to make money that night?" He also mentioned that Faith had turned against them by wearing a wire, saying, "I know even if you didn't take the money, you wouldn't turn me in to the police." Cumba, Jr. then asked Jessica to think it over and get back to him. Jessica went home and, the next morning, called the Tiverton police.

There is no force to Boyer's argument that the judge should have limited Jessica's testimony to the case against Cumba, Jr., or that the trial judge abused his discretion in denying the motions to sever. Although Boyer recognizes that the statement was probative of his participation in the joint venture in that it was indicative of the same strategy employed in the Faith and Pacheco cases, Boyer claims that there was no proof of his knowledge or approval of Cumba, Jr.'s attempt to influence Jessica. Boyer asserts that his connection to Cumba, Jr.'s attempt to influence Jessica was too tenuous and, in any event, it could not be offered against him because the joint venture to which this evidence related (i.e., the Faith indictment) ended on May 26, 1995.

Jessica's testimony had sufficient probative value on the question of Boyer's attempt to "fix" the other two cases. The com-

mon scheme was, in fact, the Commonwealth's theory of the case. See *Commonwealth* v. *Schoening*, 379 Mass. 234, 242 (1979) (where a charge was conspiracy to bribe a public official, prior bad acts showed a common scheme underlying all the transactions). See also *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695-696 (1979) (in a stolen securities and counterfeiting case, other similar schemes of the defendant carried out during the same period of time of the subject indictments admissible on the issue of intent, motive, and method); *Commonwealth* v. *Luna*, 410 Mass. 131, 140 (1991) (evidence of uncharged sales of cocaine admissible to show participation in joint venture); *Commonwealth* v. *Odell*, 34 Mass. App. Ct. 100, 102-104 (1993) (postindictment conduct showed a similar pattern of behavior). Contrast *Commonwealth* v. *Emence*, 47 Mass. App. Ct. 299, 304-305 (1999) (subsequent bad conduct did not show an actual pattern, but merely two distinct episodes of similar criminal acts). Here, the judge was well within his discretion in admitting the evidence, which involved an incident that took place within three months of the acts for which Boyer stood trial and thus was timely. As far as proving a pattern, Cumba, Jr.'s conversation with Jessica was "better than acts which show a pattern; [it was] the pattern." See *Commonwealth* v. *Odell*, 34 Mass. App. Ct. at 103. We discern no error. See *Commonwealth* v. *Leonardi*, 413 Mass. 757, 763 (1992), and cases cited.

Boyer argues further that Jessica's testimony necessitated either severance of Boyer's and Cumba, Jr.'s trials, or redaction of any reference to Boyer from the testimony. See *Bruton* v. *United States*, 391 U.S. 123, 135-136 (1968). "[S]everance is constitutionally required where: a co-defendant's extrajudicial statements are offered in evidence at a joint trial; the statements are '*clearly inadmissible*' as against the defendant; the codefendant does not testify; and finally, there is a substantial possibility that, in determining the defendant's guilt, the jury relied on the codefendant's 'powerfully incriminating extrajudicial statements' notwithstanding any limiting instructions from the judge." *Commonwealth* v. *Collado*, 426 Mass. 675, 681 (1998), quoting from *Commonwealth* v. *Adams*, 416 Mass. 311, 314 (1988) (emphasis supplied). There was no *Bruton* violation

in this case because Cumba, Jr.'s statements to Jessica were admissible against Boyer as statements made by a joint criminal venturer. See *Commonwealth* v. *Brown*, 394 Mass. 510, 514-516 (1985); *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990); *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994); *Commonwealth* v. *Murphy*, 6 Mass. App. Ct. 335 (1978). Under this exception to the hearsay rule, statements by a joint venturer are admissible against a defendant when the statements were made during the pendency of the cooperative effort and in furtherance of its goal. See *Commonwealth* v. *Collado*, 426 Mass. at 681. The judge instructed the jury that Cumba, Jr.'s statements to Jessica could be considered only if the jury found "on the basis of all the other evidence," not including those statements, that the defendants were engaged in a joint venture to commit or conceal criminal conduct and that the statements were made for that purpose. The modus operandi of witness interference was nearly identical, involved the same culpable parties, and was made prior to the disposition of Faith and Pacheco's criminal complaints. There was abundant evidence apart from Cumba, Jr.'s conversation with Jessica that a joint venture existed; thus, under the joint venture exception to hearsay rule, the statements were admissible. This fact necessarily disposes of Boyer's *Bruton* claim. See *Commonwealth* v. *Collado, supra* at 681-682.

Finally, Boyer urges that the admission of portions of his grand jury testimony, in which he indicated that he knew Faith was wearing a "wire" during meetings with him, and he chose not to speak with her, suggested that his silence meant he was guilty and thus was prejudicial error. At trial, the prosecutor argued that this testimony would explain to the jury the reason Boyer never spoke to Faith when the police sent her into the courthouse to record her conversation with him, and would rebut any inference that he did not converse with her because he was not involved in the bribery scheme. Initially, the judge refused to permit the evidence, but the Commonwealth moved for reconsideration; over Boyer's objection, the judge altered that earlier ruling. The evidence was admitted in the form of a

written "stipulation,"[2] to which the prosecutor later referred in closing argument.

The inference that Boyer's silence suggested guilt and reluctance to make incriminating statements to Faith is inappropriate. It is true that "[w]here a party is confronted with an accusatory statement which, under the circumstances, a reasonable person would challenge, and the party remains silent or responds equivocally, the accusation and the reply may be admissible on the theory that the party's response amounts to an admission of the truth of the accusation." See *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 506 (1992); Liacos, Massachusetts Evidence § 6.7.2(e) (1999). Nonetheless, our decisions have expressed a "general wariness" of admissions by silence. See *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 316 (1973); *Commonwealth* v. *MacKenzie*, 413 Mass. at 506 (noting that the meaning of a response or lack thereof to an accusatory statement is often ambiguous).

Simply stated, there was nothing said by Faith to Boyer that Boyer reasonably could have been expected to deny or rebut. Faith attempted merely to engage Boyer in conversation. Boyer declined, as any reasonable person might do for any number of reasons. Nor, under these circumstances, does Boyer's awareness that Faith was wearing a wire change the analysis. The testimony was inadmissible.

We may find error nonprejudicial only if we are sure it did not influence the jury, or had but a very slight effect. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994); *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445-446 (1983). Given the strength of the Commonwealth's case, we conclude that the admission of the improper testimony was not prejudicial. In addition to the testimony of Faith, Pacheco, and Jessica, Boyer was observed at critical times during surveillance by the police, conversing with Faith and Picard. The payoff to Pacheco

---

[2]The stipulation was as follows: "Mr. Boyer was questioned by an assistant attorney general on July 26, 1996, and answered with the following sworn testimony. Mr. Boyer was asked if he knew [Faith] cooperated with the state police. Mr. Boyer answered: I knew she was going to be wired to listen to my conversations. Mr. Boyer was asked about conversations after that. Mr. Boyer answered: I didn't have any conversations with [Faith]."

inside Boyer's law office, three days after Pacheco failed to appear in court, was particularly devastating.

2. *Cumba, Jr.'s appeal.* Cumba, Jr.'s first contention parallels that of Boyer. With respect to Jessica's testimony, Cumba, Jr. claims that evidence of other independent crimes cannot be admitted to show commission of the crimes charged. Over his objection, the judge admitted the testimony, which included statements by Cumba, Jr. regarding the alleged bribery of Faith, as well as the solicitation of Jessica. The judge ruled that the putative value of Jessica's testimony substantially outweighed the risk of unfair prejudice. There is no force to Cumba, Jr.'s argument that those statements to Jessica were more unfairly prejudicial than probative and that, therefore, the judge abused his discretion in admitting this testimony. Although Cumba, Jr. recognizes that the statement was probative of his participation in the joint venture in that it was indicative of a plan or scheme, he argues that the conversation with Jessica occurred some two months after the attempt to bribe Faith. Cumba, Jr.'s comparison to *Commonwealth* v. *Emence*, 47 Mass. App. Ct. at 304, is misplaced. In that case, the charges included assault by means of a dangerous weapon — scalding coffee and a chain — during a home invasion. As here, the judge admitted testimony of a similar act which occurred several months later — the defendant, while awaiting trial, poured a cup of boiling hot chocolate on the neck and shoulder of another pretrial detainee. In those circumstances, we concluded that reversible error occurred, not due to the timing of the supposed bad act, but largely because evidence of the subsequent scalding incident had no real purpose, other than proving the defendant's propensity to commit such a crime. Here, the similar conduct evidence was inextricably linked to all of the events which gave rise to the charges against Cumba, Jr. See *Commonwealth* v. *King*, 387 Mass. 464, 469-473 (1982) (at trial for unlawful intercourse with child under sixteen, evidence that defendant had similar sexual relations with sibling of victim was probative of a pattern of conduct). Moreover, whatever prejudicial effect the Jessica testimony may have had was ameliorated by an appropriate limiting instruction that informed the jury not to consider the testimony as indicative of bad character or propensity to commit crimes.

Next, Cumba, Jr. argues that the judge's refusal to sever Boyer's indictments for trial violated Cumba, Jr.'s confrontation rights when the Commonwealth admitted a portion of Boyer's grand jury testimony. See note 2, *supra*. The Supreme Judicial Court has held that when a codefendant's statement becomes inculpatory of a defendant only "when linked with other evidence adduced at trial, generally a limiting instruction is sufficient to cure a violation of the defendant's confrontation rights." See *Commonwealth* v. *McAfee*, 430 Mass. 483, 488 (1999) (finding no error where codefendant's statement did not identify defendant as shooter, nor claim to place him at crime scene), and cases cited. See also *Richardson* v. *Marsh*, 481 U.S. 200, 208-209 (1987). In the instant case, the disputed evidence falls outside the scope of *Bruton* because Boyer's statement was not facially incriminating, but instead became incriminating — if at all — only when linked with other evidence presented at trial. See *Commonwealth* v. *McAfee*, 430 Mass. at 488-489.

Additionally, the judge interrupted Boyer's counsel's closing argument, which immediately followed the admission of Boyer's sworn statement, to caution the jury to use that evidence against only Boyer, and not to consider it in determining Cumba, Jr.'s guilt.[3] Such a limiting instruction is sufficient to cure confrontation clause defects unless "the circumstances of the

[3]The admissibility and form of this evidence were debated at length by the judge and attorneys. The source of the disputed evidence was Boyer's statements to the grand jury. Ultimately, the judge ruled that he would admit a "greatly boiled down edited version of Mr. Boyer's answers regarding knowledge that [Faith] was wired." The judge determined that a "fair format" would be to allow the Commonwealth to read the evidence to the jury as "sworn testimony and asked questions by the assistant attorney general." Because the judge had previously declined to admit the evidence, the Commonwealth had already rested its case, and the judge allowed the prosecutor to reopen the case. See note 2, *supra*.

Closing arguments followed the assistant attorney general's testimony. The judge interrupted Boyer's counsel's argument to give a limiting instruction.

"There's something I should have said to the jury a few minutes ago . . . . [The assistant attorney general] a few minutes ago read a stipulated statement that Mr. Boyer gave to questions from the assistant attorney general. I should have told you at the time and I am telling you now, that's only evidence in the case of Mr. Boyer, it cannot in any way be considered as evidence regarding Mr. Cumba's case or in any

case and the nature of the co-defendant's statement so obvi-
ously implicate the defendant in the crime itself as virtually to
constitute direct incrimination." See *Commonwealth* v. *McAfee*,
430 Mass. at 488, quoting from *Commonwealth* v. *Blake*, 427
Mass. 57, 60 (1998). That is not the case here.

*Judgments affirmed.*

---

way be considered as evidence against Mr. Cumba."

Finally, in his instructions, the judge reiterated this limitation to the jury.
"[A]t different points in the trial I have told you that certain parts of the
evidence, a certain piece, is not admissible against one defendant. That
principle, I remind you, that there are various parts I said is limited to one
defendant's case and not the other defendant's case, and that must be a
principle for you to apply."